Kristin A. Zilberstein, Esq. (SBN 47798)
Liepold Harrison & Associates PLLC
370 W. Las Colinas Blvd., Suite 220
Irving, TX 75039
Ph: 817-522-7531
kzilberstein@lha-law.com

Hon. Christopher M. Alston
May 7, 2026 9:30 AM
Location: Ctrm. 7206
Response: April 30, 2026

Attorney for Secured Creditor Live Oak Banking Company, its successors and assigns

# UNITED STATES BANKRUPTCY COURT

## WESTERN DISTRICT OF WASHINGTON

### SEATTLE DIVISION

| | |
|---|---|
| In re: | CASE NO: 26-11088-CMA |
| Bubbles & Barks, LLC<br>Consolidated with<br>Bubbles & Barks Holdings, LLC (26-11089) | CHAPTER 11 |
| Debtor | **OPPOSITION TO MOTION FOR USE OF CASH COLLATERAL** |

**TO THE HONORABLE CHRISTOPHER M ALSTON, UNITED STATES BANKRUPTCY JUDGE, THE DEBTOR, DEBTOR'S COUNSEL, THE UNITED STATES TRUSTEE AND ALL OTHER INTERESTED PARTIES:**

Live Oak Banking Company, its successors and/or assigns ("LOB"), hereby provides the following response to Debtor's Motion for Use of Cash collateral.

### FACTUAL/PROCEDURAL BACKGROUND

LOB has a security interest in all accounts, inventory, equipment, furniture, tangible property, general intangibles, fixtures, chattel paper, instruments, and the real property commonly

Opposition to Motion for Use of Cash Collateral - Page 1

Kristin A. Zilberstein, Esq. (SBN 47798)
Liepold Harrison & Associates PLLC
370 W. Las Colinas Blvd., Suite 220
Irving, TX 75039
Ph: 817-522-7531

known as 1728 FM 1855, Marble Falls, TX 78654 ("Property"). Attached hereto is a true and correct copy of the Security Agreement as **Exhibit "1"**. Attached hereto is a true and correct copy of the Deed of Trust as **Exhibit "2"**. The security interest arises from a Promissory Note, secured by a Deed of Trust, Loan Agreement, and Security Agreement dated June 8, 2023, and recorded in the official records of the County Recorder of Burnet County, Texas, as Document No.: 202305576 DT on June 9, 2023. A true and correct copy of the Note is attached hereto as **Exhibit "3"**. A true and correct copy of the Loan Agreement is attached hereto as **Exhibit "4"**.

Debtor filed the current bankruptcy case on April 6, 2026 to stop a foreclosure sale which LOB had scheduled for April 7, 2026. The cases were consolidated for administration on April 9, 2026. The current Motion for Use of Cash Collateral was filed April 23, 2026.

## ARGUMENT

### A.  LOB HAS A SECURITY INTERST IN THE CASH COLLATERAL

The Deed of Trust itself executed by Debtor provides for the assignment of rents from the Property to LOB. LOB is the beneficial interest holder of the Deed of Trust based on the recorded Deed of Trust. Debtor executed and delivered said Deed of Trust in connection with entering into the Note and the Deed of Trust was duly recorded in accordance with Texas law prior to filing the bankruptcy case. _United Sav. Ass'n of Texas v. Timers of In Wood Forest Assocs., Ltd_, 484 U.S. 365, 374, 108 S.Ct. 626, 632 (1988). As such, it is undisputed that Debtor agreed that the rents generated by the Property were collateral for LOB's loan.

### B.  LOB OBJECTS TO THE USE OF ITS CASH COLLATERAL

Pursuant to 11 U.S.C. § 363(c)(2), a debtor may not use, sell or lease cash collateral unless the secured creditor consents, or the court authorizes the use after notice and a hearing. LOB does not consent to Debtor's use of its cash collateral.

In the Motion for Use of Cash Collateral, Debtor fails to identify the Property as part of the security interest for LOB's lien or that LOB holds an assignment of rents. Debtor focusses solely on the personal property as the sole source of security.

Opposition to Motion for Use of Cash Collateral - Page 2

Kristin A. Zilberstein, Esq. (SBN 47798)
Liepold Harrison & Associates PLLC
370 W. Las Colinas Blvd., Suite 220
Irving, TX 75039
Ph: 817-522-7531

Case 26-11088-CMA    Doc 25    Filed 04/30/26    Ent. 04/30/26 12:42:42    Pg. 2 of 83

Debtor provides a budget related to Barkingham Palace which is operated at the Property. That budget includes costs for a variety of expenses including but not limited to: bank charges, insurance, office supplies, payroll, meals, training, travel, and supplies. It is unclear how the office supplies and supplies are different. In addition, it is unclear what business travel is associated with this operation. Based upon the limited information at this time, Barkingham Palace would not require travel. It is a self-contained business with one location. Further, the bank charges appear excessive. An alternate institution which charges less is appropriate. Even though, the property has sufficient income for the expenses whether appropriate or not, Debtor does not propose a sufficient adequate protection payment to LOB. This will result in the default to LOB growing rather than decreasing. The proposed monthly payment is less than half of the regular monthly payment. Thus, LOB requests that the net income be paid as adequate protection following only reasonable fees and costs.

**C.     DEBTOR SHOULD BE REQUIRED TO SEGREGATE LOB'S CASH COLLATERAL**

Pursuant to 11 U.S.C. §363(c)(4), the Debtor is required to segregate and account for all cash collateral. Debtor is operating and managing the property of the bankruptcy estate, including the Property securing LOB's lien, as a Debtor in Possession under the Code. See, 11 U.S.C. §§ 1107, 1108. As such, Debtor has a fiduciary obligation to segregate and account for LOB's cash collateral. See, 11 U.S.C. §363(c)(4); *In re Krisle*, 54 B.R. 330, 341 (BC D SD 1985). Debtor is required to open and maintain a separate DIP for the Property to properly account for any and all rents received and expenses associated with respect to the Property since filing for bankruptcy. Pursuant to the Motion for Use of Cash Collateral, DIP accounts have not yet been established.

**D.     DEBTOR'S MOTION SHOULD BE DENIED BECAUSE IT FAILED TO MEET THE BURDEN OF SHOWING THAT LOB IS ADEQUATELY PROTECTED**

Pursuant to Section 363(e), the court shall condition a debtor's use, sale or lease of property "as is necessary to provide adequate protection of such interest." 11 U.S.C. §363(e). A secured

Opposition to Motion for Use of Cash Collateral - Page 3

Kristin A. Zilberstein, Esq. (SBN 47798)
Liepold Harrison & Associates PLLC
370 W. Las Colinas Blvd., Suite 220
Irving, TX 75039
Ph: 817-522-7531

creditor may have perfected security interests in real property and in rents generated by the property. Each of these interests must be adequately protected. (*In re Buttermilk Towne Centre, LLC,* 442 B.R. 558, 566 (6th Cir. BAP 2010) (cit. om.); *In re Apple Tree Partners, L.P.,* 131 B.R. 380, 400 (Bankr. W.D. Tenn. 1991); *In re Safeguard Self-Storage Trust,* 2 F.3d 967, 973 (9th Cir. 1993); *In re Cafeteria Operators, L.P.* 299 B.R. 400, 406 (Bankr. N.D. Tex. 2003); *In re Wrecclesham Grange, Inc.,* 221 B.R. 978, 981 (Bankr. M.D. Fla. 1997) ("Adequate protection is designed to assure that a secured creditor does not suffer a decline in the value of its interest in the estate's property while the automatic stay remains in effect.").

The secured lender has the burden of proof on the issue of validity, priority and/or extent of its lien on the property. 11 U.S.C. §363(p)(2).  The debtor has the burden of proof on the issue of adequate protection.  11 U.S.C. §363(p)(1).  Section 363(e) conditions the use of cash collateral upon the debtor in possession adequately protecting the secured creditor's interest therein.  Unless the Debtor can provide LOB with adequate protection for its use of cash collateral, the Debtor may not use such funds over LOB's objection.  (*See,* 11 U.S.C. Section 363(c)(2);  *In re Scottsdale Med Pavilion,* 159 BR 295, 302-303 (9th Cir. BAP 1993) (affirming trial court's denial of debtor's use of cash collateral due to lack of adequate protection.

It is the Debtor's burden to prove that LOB will receive adequate protection for the value of its interest in the cash collateral which they seek to use.  (*In re Scottsdale Med. Pavilion, supra*, 159 BR 302 (recognizing that "debtor bore the burden of proof on the issue of adequate protection); *First Bank of Miller v. Wiesler*, 45 BR 871, 877 (D.SD. 1985) (holding burden is on the debtor to show that a secured creditor is adequately protected; motion to use cash collateral denied).  The standard that the debtor must satisfy in this regard is "a strict one." *In re Polzin*, 49 BR 370, 371-372 (Bankr. D. Minn. 1985) (stating "due to the fact that the collateral is consumed or used upon in a Section 363 context and the creditor's use is not merely delayed as in a  Section 362 context, the adequate protection standard is a strict one").

At this time, Debtor has not addressed the equity in the Property because Debtor omitted it as part of LOB's security.  Without addressing the equity or the fact that the Property is part of LOB's

Opposition to Motion for Use of Cash Collateral - Page 4

Kristin A. Zilberstein, Esq. (SBN 47798)
Liepold Harrison & Associates PLLC
370 W. Las Colinas Blvd., Suite 220
Irving, TX 75039
Ph: 817-522-7531

security interest, the Motion for Use of Cash Collateral cannot be granted because the analysis is incomplete to determine whether LOB is adequately protected.  In anticipation of the foreclosure, LOB obtained an appraisal.  The value is $1,060,000.00.  As of December 2025, the amount owed on the loan was $1,791,040.47.  Therefore, LOB does not have an equity cushion.  Therefore, all amounts remaining over and above the **reasonable** expenses related to the property should be paid to LOB.

### CONCLUSION

Pursuant to the terms of the Deed of Trust, LOB is entitled to the cash collateral.  Generally, the equity cushion would suffice as adequate protection to an oversecured creditor.  However, in this instance, LOB is under secured.  There is no equity to provide adequate protection.  Thus, LOB should be awarded all cash collateral from this property that is not for **reasonable** expenses associated with the Property.

DATED: April 30, 2026

**LIEPOLD HARRISON & ASSOCIATES, PLLC**

By: /s/ Kristin A. Zilberstein
    Kristin A. Zilberstein, ESQ.
    Attorney for Live Oak Banking Company

Opposition to Motion for Use of Cash Collateral - Page 5

Kristin A. Zilberstein, Esq. (SBN 47798)
Liepold Harrison & Associates PLLC
370 W. Las Colinas Blvd., Suite 220
Irving, TX 75039
Ph: 817-522-7531

<u>**CERTIFICATE OF SERVICE**</u>

I, Shaunna Hicks, certify that I am a resident of Orange County, I am over the age of eighteen (18) and not a party to the within action, and that my business address is: 370 W Las colinas Blvd., Suite 220, Irving, TX 75039.

On **April 30, 2026**, I served the within **Opposition to Motion for Use of Cash Collateral** on all interested parties in this proceeding by placing a true and correct copy thereof enclosed in a sealed envelope with postage pre-paid in the United States Mail at Irvine, California, addressed as follows:

| | |
|---|---|
| Bubbles & Barks, LLC<br>P.O. Box 358<br>Monroe, WA 98272<br>*Debtors* | Bubbles & Barks Holdings, LLC<br>P.O. Box 358<br>Monroe, WA 98272<br>*Debtors* |
| 20 Largest Unsecured Creditors<br>IRS<br>Centralized Insolvency<br>P.O. Box 7346<br>Philadelphia, PA 19101-7346 | WA Department of Revenue<br>2101 4th Ave., Suite 1400<br>Seattle, WA 98121 |
| WA Dept. of L&I<br>Bankruptcy Unit<br>P.O. Box 44171<br>Olympia, WA 98504 | WA Employment Security Dept.<br>P.O. Box 9046<br>Olympia, WA 98507-9046 |
| American Business LOC<br>PO Box 30009<br>Salt Lake City, UT 84130 | Attorney General for WA State<br>Bankruptcy & Collections Unit<br>800 Fifth Ave., 20th Floor<br>Seattle, WA 98104 |
| Chase Business Credit Card<br>PO Box 15298<br>Wilmington, DE 19850 | United States Attorneys Office<br>Attn: Bankruptcy Assistant<br>700 Stewart Street, Room 5220<br>Seattle, WA 98101 |

1

In addition to any paper copies served by U.S. Mail, registered ECF participants, including parties who have requested Special Notice in this case, will receive an electronic copy of the foregoing document when it has been filed with the Court.

Jennifer L Neeleman, Debtor's Counsel jennifer@neelemanlaw.com

Thomas D Neeleman, Debtor's Counsel courtmail@neelemanlaw.com

Michael S DeLeo, Sub V Trustee trustee@aztrustee.com

US Trustee USTPRegion18.SE.ECF@usdoj.gov

Ryan S Moore, US Trustee Counsel ryan.moore@usdoj.gov

I certify under penalty of perjury the foregoing is true and correct.

Executed on **April 30, 2026**, at Irving, Texas.

_/s/ Shaunna Hicks_
**Shaunna Hicks**

# EXHIBIT 1

# SECURITY AGREEMENT

**Date:** June 8, 2023

**Debtor:** Bubbles & Barks Holdings, LLC,
a Texas limited liability company, and
Bubbles & Barks, LLC,
a Washington limited liability company

**Debtor's Mailing Address:** 1728 FM 1855
Marble Falls, Texas 78654

**Secured Party:** Live Oak Banking Company

**Secured Party's Mailing Address:** 1741 Tiburon Drive
Wilmington, North Carolina 28403

**Classification of Collateral:** Accounts, Equipment, Inventory, Fixtures,
General Intangibles, Chattel Paper and Instruments

**Collateral (including all accessions and substitutions):**

See <u>Schedule 1</u> attached hereto and incorporated herein for all purposes.

**Obligation:**

**Note:**

**Date:** June 8, 2023

**Amount:** $1,800,000.00

**Maker:** Bubbles & Barks Holdings, LLC,
a Texas limited liability company, and
Bubbles & Barks, LLC,
a Washington limited liability company

**Payee:** Live Oak Banking Company

**Terms of Payment:** Payable as to principal and interest as therein provided.

SECURITY AGREEMENT - Page 1
███████████ .AGR.wpd

Subject to the terms of this Security Agreement, Debtor grants to Secured Party a first lien and prior security interest in the Collateral and all its proceeds (as described on Schedule 1 attached hereto), to secure payment and performance of Debtor's Obligation in this Security Agreement and all renewals and extensions of the Obligation.

## Debtor's Warranties

1. Financing Statement. No financing statement covering the Collateral is filed in any public office, except for financing statements in favor of Secured Party.

2. Ownership. Debtor owns the Collateral and has the authority to grant this security interest. Ownership is free from any setoff, claim, restriction, lien, security interest, or encumbrance except this security interest and liens for taxes not yet due.

3. Financial Statement. All information about Debtor's financial condition provided to Secured Party was accurate when submitted, as will be any information subsequently provided.

4. Setoffs. No obligors whose debts or obligations are part of the Collateral have any right to setoffs, counterclaims, or adjustments or any defenses in connection with their debts or obligations.

## Debtor's Covenants

1. Protection of Collateral. Debtor will defend the Collateral against all claims and demands adverse to Secured Party's interest in it and will keep it free from all liens except those for taxes not yet due and from all security interests except this one. Debtor will maintain the Collateral in good condition and protect it against misuse, abuse, waste, and deterioration except for ordinary wear and tear resulting from its intended use.

2. Financial Statements and Other Information. The Debtor shall furnish, in form and content as shall be satisfactory to the Secured Party in its sole discretion, the following:

(a) Promptly upon receipt thereof, copies of all financial reports, if any, submitted to the Debtor, by their auditors in connection with each annual or interim audit of their financial books and records by such auditors.

(b) Promptly upon the commencement thereof, written notice of any litigation, including arbitrations, and of any proceedings before any governmental agency which would, if successful, materially affect the Debtor or where the amount involved exceeds $25,000.00 and is not acknowledged by any insurance carrier to be covered in full by insurance required to be maintained under Section 3 of this Security Agreement;

(c)     With reasonable promptness, such other information respecting the business, operations and financial condition of the Debtor as the Secured Party may from time to time require, including, but not limited to, balance sheets, statements of profits and losses, statements or change in financial position, and tax returns, and in a form acceptable to the Secured Party. The Secured Party is hereby authorized to deliver a copy of any financial statement or any other information relating to the business, operations, or financial condition of the Debtor which may be furnished to it or come to its attention to any regulatory body or agency having jurisdiction over the Secured Party or to any person which shall succeed to all or any part of the Secured Party's interest in the Obligation and this Security Agreement.

3.     Insurance. Debtor will insure the Collateral in accordance with Secured Party's reasonable requirements regarding choice of carrier, casualties insured against, and amount of coverage. Policies will be written in favor of Debtor and Secured Party according to their respective interests or according to Secured Party's other requirements. All policies will provide that Secured Party will receive at least thirty (30) days' prior written notice before cancellation, and the policies or certificates evidencing them will be provided to Secured Party when issued. Debtor assumes all risk of loss and damage to the Collateral to the extent of any deficiency in insurance coverage. Debtor irrevocably appoints Secured Party as attorney-in-fact to collect any unearned premiums and proceeds of any insurance on the Collateral and to endorse any draft or check deriving from the policies and made payable to Debtor or jointly payable to Debtor and Secured Party.

4.     Secured Party's Costs. Debtor will pay all expenses incurred by Secured Party in obtaining, preserving, perfecting, defending, and enforcing this security interest or the Collateral and in collecting or enforcing the Obligation. Expenses for which Debtor is liable include, but are not limited to, taxes, assessments, reasonable attorney's fees, and other legal expenses. These expenses will bear interest from the dates of payment at the highest rate stated in the promissory note that is part of the Obligation, and Debtor will pay Secured Party this interest on demand at a time and place reasonably specified by Secured Party. These expenses and interest will be part of the Obligation and will be recoverable as such in all respects.

5.     Additional Documents. Debtor shall execute such other documents that Secured Party considers necessary to obtain, maintain, and perfect this security interest or to comply with any relevant law.

6.     Notice of Changes. Debtor shall immediately notify Secured Party of any material change in the Collateral; change in Debtor's name, address or location; change in the location of all or any part of the Collateral; change in any matter warranted or represented in this Security Agreement; change that may affect this security interest; and any event of default.

7. <u>Use and Removal of Collateral</u>. Debtor will use the Collateral primarily according to the stated classification unless Secured Party consents otherwise in writing. Debtor shall not permit the Collateral to become an accession to any goods, to be commingled with other goods, or to become an accession or part of a product or mass with other goods except as expressly provided in this Security Agreement.

8. <u>Sale</u>. Debtor shall not sell, transfer, or encumber any of the Collateral without the prior written consent of Secured Party, except in the normal conduct of Debtor's business.

9. <u>Modification of Collateral</u>. Without the written consent of Secured Party, Debtor shall not agree to any modification of terms in any instruments constituting Collateral, or securing same.

10. <u>Disposition of Collateral</u>. Debtor shall immediately assign or endorse to Secured Party on request any future instruments constituting Collateral, or securing same.

11. <u>Parties Liable on the Collateral</u>. Debtor shall preserve the liability of all obligors on the Collateral, preserve the priority of all liens and security for the Collateral, and deliver to the Secured Party all instruments constituting Collateral, or securing same. Debtor shall not release any lien or interest securing the Collateral without the prior written consent of Secured Party.

12. <u>Delivery of Receipts to Secured Party</u>. In the event of a default under the terms of the Obligation, and on Secured Party's demand, Debtor will deposit all payments received as proceeds of and payments on Collateral in a special bank account designated by Secured Party, who alone will have power of withdrawal. Debtor will deposit the payments on receipt, in the form received, and with any necessary endorsements as security for the Obligation. Secured Party may make any endorsements in Debtor's name and behalf. Between receiving and depositing these payments, Debtor shall not mingle them with any of Debtor's other funds or property but shall hold them separate in an express trust for Secured Party. Secured Party shall apply these funds against the Obligation.

13. <u>Default in Collateral</u>. Debtor shall cause all obligors on the Collateral to pay and perform all obligations under the Collateral. Debtor shall immediately inform Secured Party in writing of the default in the payment or performance of any obligation under the Collateral.

14. <u>Consumer Credit</u>. If any Collateral or proceeds include obligations of third parties to Debtor, the transactions creating those obligations will conform in all respects to applicable state and federal consumer credit law.

15. <u>Collateral Records</u>. Debtor shall keep accurate and complete records of the Collateral (including proceeds). Secured Party may at any time have access to, examine, audit, make extracts from and inspect, without hindrance or delay, Debtor's records, files and the Collateral.

16. <u>Taxes</u>. Debtor agrees to pay prior to delinquency all taxes, charges, liens and assessments against the Collateral, and upon the failure of Debtor to do so, Secured Party, at its option, may pay any of them and shall be the sole judge of the legality or validity thereof and the amount necessary to discharge the same. Any such payment by Secured Party shall become part of the Obligation secured hereunder and shall be paid to Secured Party by Debtor immediately and without demand, with interest thereon at the rate of interest charged under the Obligation.

17. <u>Modification of Contracts</u>. Debtor shall not modify, extend or substitute any contract the terms of which shall at any time have given rise to accounts receivable secured hereby, except in the ordinary course of Debtor's business or with the prior written consent of Secured Party.

## Events of Default

Each of the following conditions is an event of default:

(a) if Debtor defaults in the timely payment or performance of the terms of the Note evidencing the Obligation, or in the performance of any terms of this Security Agreement;

(b) if any warranty, covenant, or representation made to Secured Party or on behalf of the Debtor proves to have been false in any material respect when made;

(c) if a receiver is appointed for the Debtor or any of the Collateral; and any receivership is not dismissed within thirty (30) days;

(d) if Debtor makes an assignment for the benefit of its creditors or, to the extent permitted by law, if bankruptcy or insolvency proceedings commence against the Debtor; or any other person liable on or for any part of the Obligation;

(e) if any financing statement regarding the Collateral but not related to this security interest and not favoring Secured Party is filed;

(f) if any lien attaches to any of the Collateral other than that created by this Security Agreement;

(g) if there shall occur any material uninsured damage to or loss, theft or destruction of any of the Collateral; or

(h) any Event of Default under any other written agreement securing the Obligation.

<u>SECURITY AGREEMENT</u> - Page 5
████████████ GR.wpd

## Remedies of Secured Party on Default

During the existence of any Event of Default, Secured Party may declare the unpaid principal and earned interest of the Obligation immediately due and payable in full, enforce the Obligation in accordance with its terms, and exercise any rights and remedies granted a secured party by the Texas Business and Commerce Code (the "Code") or by this Security Agreement, including, but not limited to, the following:

(a) require Debtor to deliver to Secured Party all books and records relating to the Collateral;

(b) require Debtor to assemble the Collateral and make it available to Secured Party at a place reasonably convenient to both parties;

(c) take possession of any of the Collateral and of this purpose enter any premises where it is located if this can be done without breach of the peace;

(d) sell, lease, or otherwise dispose of any of the Collateral in accordance with the rights, remedies, and duties of a secured party under the Code after giving notice as required by the Code; and unless the Collateral threatens to decline speedily in value, is perishable, or would typically be sold on a recognized market, Secured Party will give Debtor reasonable notice of any public sale of the Collateral or of a time after which it may be otherwise disposed of without further notice to Debtor; in this event, notice will be deemed reasonable if it is mailed, postage prepaid, to Debtor at the address specified in this Security Agreement at least ten (10) days before any public sale or ten (10) days before the time which the Collateral may be otherwise disposed of without further notice to Debtor;

(e) surrender any insurance policies covering the Collateral and receive the unearned premium;

(f) apply any proceeds from disposition of the Collateral after default in the manner specified in the Code, including payment of Secured Party's reasonable attorneys' fees, costs of collection and court expenses;

(g) at Secured Party's discretion, retain the Collateral in satisfaction of the Obligation wherever the circumstances are such that the Secured Party is entitled to do so under the Code, or otherwise; and

(h) if disposition of the Collateral leaves the Obligation unsatisfied, collect the deficiency from Debtor and any guarantors of the Obligation.

## General Provisions

1. <u>Collection Rights</u>.

    (a)    So long as an Event of Default has occurred and is continuing, Secured Party may at any time notify the account debtor on any accounts receivable of Debtor of its security interest, if any, therein, and may demand that monies due or to become due to be paid directly to Secured Party. In connection with the right of Secured Party to collect accounts receivable under this paragraph, Debtor hereby irrevocably appoints Secured Party or any person designated by Secured Party, its true and lawful attorney-in-fact to endorse for Debtor or Debtor's name any check, draft or other order for payment of money payable to Debtor in payment of any accounts receivable owing to Debtor. Secured Party's costs and collection and enforcement, including attorneys' fees and out-of-pocket expenses, shall be borne solely by Debtor. Secured Party shall not be liable for any act of omission on the part of Secured Party, or its officers, agents or employees, except gross negligence or willful misconduct.

    (b)    So long as any Event of Default has occurred and is continuing, and after exercising its right under this Section, Secured Party may, without notice to Debtor, renew, modify or extend any accounts receivables, grant waivers or indulgences with respect thereto, accept partial payments thereon, release, surrender or substitute any customer security or make compromises with or release Debtor or any other party liable thereon in such manner as Secured Party may, in its sole discretion, deem advisable, without affecting or diminishing Debtor's continuing obligations upon such accounts receivable.

2.     <u>Parties Bound</u>. Secured Party's rights under this Security Agreement shall inure to the benefit of its successors and assigns. Assignment of any part of the Obligation and delivery by Secured Party of any part of the Collateral shall fully discharge Secured Party from responsibility for that part of the Collateral. If Debtor is more than one entity, all their representations, warranties, and agreements are joint and several. Debtor's obligations under this Security Agreement shall bind Debtor's successors and assigns.

3.     <u>Waiver</u>. Neither delay in exercise nor partial exercise of any of Secured Party's remedies or rights shall waive further exercise of those remedies or rights. Secured Party's failure to exercise remedies or rights does not waive subsequent exercise of those remedies or rights. Secured Party's waiver of any Event of Default does not waive its right to demand strict compliance with the terms of this Security Agreement. Secured Party's waiver of any right in this Security Agreement or of any Event of Default is binding only if it is in writing.

4. <u>Reimbursement</u>. If Debtor fails to perform any of Debtor's obligations under this Security Agreement, Secured Party may perform those obligations and be reimbursed by Debtor on demand at the place where the Obligation is payable for any sums so paid, including attorney's fees and other legal expenses, plus interest on those sums from the dates of payment at the rate stated in the Obligation for matured, unpaid amounts. The sum to be reimbursed shall be secured by this Security Agreement.

5. <u>Interest Rate</u>. Interest included in the Obligation shall not exceed the maximum amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law; any interest in excess of that maximum amount shall be credited to the principal of the Obligation or, if that has been paid, refunded. Upon any acceleration or permitted prepayment of the Obligation, any excess interest shall be canceled automatically as of the acceleration or prepayment or, if already paid, credited on the principal amount of the Obligation or, if the principal amount has been paid, refunded.

6. <u>Modifications</u>. No provisions of this Security Agreement shall be modified or limited except by written agreement between the Debtor and Secured Party.

7. <u>Severability</u>. The unenforceability of any provision of this Security Agreement will not affect the enforceability or validity of any other provision.

8. <u>Applicable Law; Placement of Performance</u>. This Security Agreement will be construed according to Texas laws, and shall be performable in Burnet County, Texas.

9. <u>Presumption of Truth and Validity</u>. If the Collateral is sold after the occurrence of an Event of Default, recitals in the bill of sale or transfer will be prima facie evidence of their truth, and all prerequisites to the sale specified by this Security Agreement and by the Code will be presumed satisfied.

10. <u>Singular and Plural</u>. When the context requires, singular nouns and pronouns include the plural.

11. <u>Priority of Security Interest</u>. This security interest shall neither affect nor be affected by any other security for any of the Obligation. Neither extensions of the Obligation, nor releases of any of the Collateral will affect the priority or validity of this security interest with reference to any third person.

12. <u>Cumulative Remedies</u>. Foreclosure of this security interest created by this Security Agreement by suit does not limit Secured Party's remedies, including the right to sell the Collateral under the terms hereof. All remedies of Secured Party may be exercised at the same or different times, and no remedy shall be a defense to any other. Secured Party's rights and remedies include all those granted by law or otherwise, in addition to those specified in this Security Agreement.

13.   Power of Attorney. The Secured Party is hereby appointed the attorney-in-fact of the Debtor for the limited purpose of carrying out the default and remedy provisions of this Security Agreement and taking any action and executing any instruments which the Secured Party may deem necessary or advisable to accomplish the purposes hereof, which appointment as attorney-in-fact is irrevocable and coupled with an interest. Debtor consents, without further notice, to Secured Party's filing or recording of any documents necessary to perfect, continue, amend or terminate its security interest.

14.   After Acquired Property. The security interest granted Secured Party extends to all collateral that is of the same classification as this Collateral and that Debtor acquires at any time during the continuation of this Security Agreement.

15.   Future Advances. This security interest granted Secured Party also secures all other present and future debts and liabilities of Debtor to Secured Party, including future advances.

16.   Loan Guaranty. The Loan secured by this lien was made under a United States Small Business Administration (SBA) nationwide program which uses tax dollars to assist small business owners. If the United States is seeking to enforce this document, then under SBA regulations:

(a)   When the SBA is the holder of the Note, this document and all documents evidencing or securing this Loan shall be construed in accordance with federal law.

(b)   Lender or SBA may use local or state procedures for purposes such as filing papers, recording documents, giving notice, foreclosing liens and other purposes. By using these procedures, SBA does not waive any federal immunity from local or state control, penalty, tax or liability. No Borrower or Guarantor may claim or assert against SBA any local or state law to deny any obligation of Borrower, or defeat any claim of the SBA with respect to this Loan.

Any clause in this document requiring arbitration is not enforceable when SBA is the holder of the Note secured by this instrument.

**[Signature Page Follows]**

SECURITY AGREEMENT - Page 9
▮▮▮▮▮▮▮▮▮▮ AGR.wpd

**[Signature Page of Security Agreement]**

**DEBTOR:**

**BUBBLES & BARKS HOLDINGS, LLC,**
a Texas limited liability company

By: _____
      Gary M. Eggleston Jr., Manager


By: _____
      Jamie P. Eggleston, Manager

**BUBBLES & BARKS, LLC,**
a Washington limited liability company

By: _____
      Gary M. Eggleston Jr., Member


By: _____
      Jamie P. Eggleston, Member


**SECURED PARTY:**

**LIVE OAK BANKING COMPANY**


By: _____

Printed Name: _____

Title: _____

**[Signature Page of Security Agreement]**

**DEBTOR:**

**BUBBLES & BARKS HOLDINGS, LLC,**
a Texas limited liability company

By: _____
     Gary M. Eggleston Jr., Manager

By: _____
     Jamie P. Eggleston, Manager

**BUBBLES & BARKS, LLC,**
a Washington limited liability company

By: _____
     Gary M. Eggleston Jr., Member

By: _____
     Jamie P. Eggleston, Member

**SECURED PARTY:**

**LIVE OAK BANKING COMPANY**

By: _____

Printed Name: _____

Title: _____

## SCHEDULE 1

All tangible and intangible property of the Debtor, whether now owned or hereafter acquired, wherever located, including, but not limited to, the Debtor's interest now owned and hereafter acquired in the following types or items of property (all terms used herein shall have the meanings set forth in Article 9 of the Uniform Commercial Code):

**All Accounts.** A security interest in all accounts now owned or existing as well as any and all that may hereafter arise or be acquired by Debtor, and all the proceeds and products thereof, including without limitation, all notes, drafts, acceptances, instruments and chattel paper arising therefrom, and all returned or repossessed goods arising from or relating to any which accounts, or other proceeds of any sale or other disposition of inventory, together with any property evidencing or relating to the Accounts (such as guaranties and credit insurance), any security for the Accounts, and all books and records relating thereto (including, but not limited to, computer-generated and/or computer-prepared information).

**All Inventory.** A security interest in all of Debtor's inventory, including all goods, merchandise, raw materials, goods, goods in process, finished goods, parts, supplies and other tangible personal property, wheresoever located, now owned or hereafter acquired and held for sale or lease or furnished or to be furnished under contracts for service or used or consumed in Debtor's business, and all additions and accessions thereto, and all leases and contracts with respect thereto, and all documents of title evidencing or representing any part thereof, and all products and proceeds thereof, whether in the possession of the Debtor, warehouseman, bailee, or any other person, and all goods and inventory returned, reclaimed or repossessed.

**All Equipment, Furniture and other Tangible Property.** A security interest in all equipment, furniture and other tangible property of every nature and description whatsoever (whether or not any of the foregoing are affixed to realty), now owned or hereafter acquired by Debtor, including all appurtenances and additions thereto, and substitutions therefor and replacement thereof, wheresoever located, including all tools, parts and accessories used in connection therewith, and the rights of the Debtor under any manufacturer's warranties relating to the foregoing.

**General Intangibles.** A security interest in all general intangibles and other personal property now owned or hereafter acquired by Debtor (including, without limitation, all payment intangibles and any personal property, causes of action, goodwill, tax refunds, licenses, franchises, trademarks, trade names, service marks, copyrights, customer lists, and patents, and all rights under license agreements for use of the same) other than goods, accounts, chattel paper, documents or instruments.

**Fixtures.** A security interest in all of Debtor's fixtures and appurtenances thereto, whether now existing or hereafter acquired, and such other goods, chattels, fixtures, equipment and personal property affixed or in any manner attached to the real estate and/or building(s) or structure(s), including all attachments, additions and accessions thereto, and replacements thereof, and articles in substitution therefore, howsoever attached or affixed (together with all tools, parts and equipment now or hereafter added to or used in connection with the foregoing), located on the real property more particularly described on Exhibit "A" attached hereto and incorporated herein.

**Chattel Paper.** A security interest in all of Debtor's interest under chattel paper, lease agreements and other instruments or documents (whether tangible or electronic), whether now existing or owned by Debtor or hereafter arising or acquired by Debtor, evidencing both a debt and security interest in or lease of specific goods.

**Instruments.** A pledge and assignment of and security interest in all of Debtor's Instruments (including, without limitation, all promissory notes and all certificated securities and all certificates of deposit) now owned or existing as well as hereafter acquired or arising instruments and documents.

as well as any accessions, additions and attachments thereto, and the proceeds and products thereof, including without limitation, all cash, general intangibles, accounts, inventory, equipment, farm products, notes, drafts, acceptances, securities, instruments, chattel paper, insurance proceeds payable because of loss or damage, or other property, benefits or rights arising therefrom, and in and to all returned or repossessed goods arising from or relating to any of the property described herein or other proceeds of any sale or other disposition of such property (including, without limitation, whatever is received upon the use, lease, sale, exchange, collections, any other utilization, or any disposition of any of the foregoing property, whether cash or non-cash, all rental or lease payments, accounts, chattel paper, instruments, documents, contract rights, general intangibles, machinery, equipment, inventory, substitutions, additions, accessions, replacements, products, and renewals of, for, or to such property, and all insurance therefor).

SCHEDULE 1 -
\GR.wpd

# EXHIBIT "A"

## Property Description

FIELD NOTES to accompany a survey plat for a 7.54 acre tract of land out of the Jefferson Barton Survey No. 104, Abstract No. 58, Burnet County, Texas, and being out of that certain tract of land described as 10 acres in a deed to Robert Lee Pacini and wife, Olivia Ann Pacini, recorded in Volume 641, Page 322 of the Real Property Records of Burnet County, Texas, and being the same tract of land described as 7.533 acres in a deed to Joe F. Adams and wife Carol S. Adams, recorded in Volume 707, Page 202 of the Real Property Records of Burnet County, Texas.

BEGINNING at a ½" iron rod found at the intersection of the north right-of-way line of F.M. Highway No. 1855, with the east line of Burnet County Road No. 121, for the southwest corner hereof and of said 10.00 acre tract.

THENCE N12°10'19"W (called N12°10'19"W), with the west line hereof and of said 10.00 acre tract, being the east line of said Burnet County Road No. 121, and partially with or near a wire fence, a distance of 591.16 feet (called 591.17 feet) to a ½" iron rod found at the base of a fence corner post at the southwest corner of that certain tract of land described as 10.00 acres in a deed to Collier Materials, Inc., recorded in Volume 1022, Page 805 of the Official Public Records of Burnet County, Texas, for the northwest corner hereof and of said 10.00 acre tract;

THENCE, with the north line hereof and of said 10.00 acre tract, being the south line of said 10.00 acre tract recorded in Volume 1022, Page 805, and with or near a wire fence, the following 2 calls:

1) N73°20'35"E (called N73°23'15"E), a distance of 313.82 feet (called 314.04 feet) to a ½" iron rod found at the base of a fence post for an angle point hereof;

2) N59°45'56"E (called N59°39'44"E), a distance of 244.09 feet (called 243.87 feet) to a ½" iron rod found at a fence corner post at the northwest corner of that certain tract of land described as 12.27 acres in a deed to the William H. Lancet and wife, Rita Lancet, recorded in Volume 1118, Page 581 of the Official Public Records of Burnet County, Texas, for the northeast corner hereof;

THENCE S12°00'06"E (called S12°00'57"E), with the east line hereof, being the west line of said 12.27 acre tract, and with or near a wire fence, a distance of 649.22 feet (called 649.33 feet) to a ½" iron rod found in the north right-of-way line of said F.M. highway No. 1855, being the south line of said 10.00 acre tract recorded in Volume 641, Page 222, and being the southwest corner of said 12.27 acre tract, for the southeast corner hereof, from which a ½" iron rod found at the southeast corner of said 10.00 acre tract recorded in Volume 641, Page 222 bears N73°25'22"E (called 73°23'15"E), a distance of 317.13 feet (called 317.14 feet);

THENCE S73°23'15"W (Basis of Bearings), with the south line hereof and of said 10.00 acre tract recorded in Volume 641, Page 222, being the north right-of-way line of said F.M Highway No. 1855, partially with or near a wire fence, a distance of 544.62 feet to the place of beginning and containing 7.54 acres.

EXHIBIT "A" - Page Solo

# EXHIBIT 2

Filed by Presidio Title 1-230279 BC

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

## DEED OF TRUST, SECURITY
## AGREEMENT AND ASSIGNMENT OF RENTS

| | |
|---|---|
| **STATE OF TEXAS** | § |
| | § |
| **COUNTY OF BURNET** | § |

THIS DEED OF TRUST, SECURITY AGREEMENT AND ASSIGNMENT OF RENTS is made by **BUBBLES & BARKS HOLDINGS, LLC,** a Texas limited liability company (the "Grantor"), whose address is 1728 FM 1855, Marble Falls, Texas 78654, to Thomas J. Colven. III, of Collin County. Texas, as Trustee for the benefit of **LIVE OAK BANKING COMPANY** (the "Beneficiary"), with offices at 1741 Tiburon Drive, Wilmington, North Carolina 28403, for the purpose of securing the payment of the indebtedness (the "Indebtedness") described in paragraphs (a), (b) and (c) below and the performance of the obligations (the "Obligations") described in paragraph (d) below as follows:

(a)     one (1) promissory note (the "Note") in the original principal amount of One Million Eight Hundred Thousand and No/100 Dollars ($1,800,000.00) executed by Grantor and Bubbles & Barks, LLC, a Washington limited liability company. and payable to the order of Beneficiary, of even date herewith, with interest on the principal amount as therein provided, and any and all renewals, modifications or extensions thereof. the provisions of the Note being incorporated herein by this reference:

(b)     any sums advanced by the Beneficiary pursuant to any of the provisions of this Deed of Trust, Security Agreement and Assignment of Rents (the "Deed of Trust"):

(c)     all other sums recoverable by the Beneficiary and all other obligations of Grantor under the provisions of the Note, this Deed of Trust. that certain Loan Agreement of even date herewith (the "Loan Agreement"), and/or any other instrument securing or governing the disbursement of the indebtedness evidenced by the Note. whether presently existing or hereinafter entered into (collectively. the "Loan Documents"): and

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

## DEED OF TRUST, SECURITY
## AGREEMENT AND ASSIGNMENT OF RENTS

| | |
|---|---|
| **STATE OF TEXAS** | § |
| | § |
| **COUNTY OF BURNET** | § |

THIS **DEED OF TRUST, SECURITY AGREEMENT AND ASSIGNMENT OF RENTS** is made by **BUBBLES & BARKS HOLDINGS, LLC,** a Texas limited liability company (the "Grantor"), whose address is 1728 FM 1855, Marble Falls, Texas 78654, to Thomas J. Colven, III, of Collin County, Texas, as Trustee for the benefit of **LIVE OAK BANKING COMPANY** (the "Beneficiary"), with offices at 1741 Tiburon Drive, Wilmington, North Carolina 28403, for the purpose of securing the payment of the indebtedness (the "Indebtedness") described in paragraphs (a), (b) and (c) below and the performance of the obligations (the "Obligations") described in paragraph (d) below as follows:

(a)     one (1) promissory note (the "Note") in the original principal amount of One Million Eight Hundred Thousand and No/100 Dollars ($1,800,000.00) executed by Grantor and Bubbles & Barks, LLC, a Washington limited liability company, and payable to the order of Beneficiary, of even date herewith, with interest on the principal amount as therein provided, and any and all renewals, modifications or extensions thereof, the provisions of the Note being incorporated herein by this reference;

(b)     any sums advanced by the Beneficiary pursuant to any of the provisions of this Deed of Trust, Security Agreement and Assignment of Rents (the "Deed of Trust");

(c)     all other sums recoverable by the Beneficiary and all other obligations of Grantor under the provisions of the Note, this Deed of Trust, that certain Loan Agreement of even date herewith (the "Loan Agreement"), and/or any other instrument securing or governing the disbursement of the indebtedness evidenced by the Note, whether presently existing or hereinafter entered into (collectively, the "Loan Documents"); and

**DEED OF TRUST, SECURITY AGREEMENT**
**AND ASSIGNMENT OF RENTS** - Page 1

▮▮▮▮▮▮▮▮▮▮

(d)     any and all of the covenants, warranties, representations and other obligations (other than to repay the Indebtedness) made or undertaken by Grantor under the Loan Documents (the "Obligations").

**TO SECURE** the full and timely payment of the Indebtedness and the performance of the Obligations, Grantor has **GRANTED, BARGAINED, ASSIGNED, SOLD and CONVEYED,** and by these presents does **GRANT, BARGAIN, ASSIGN, SELL and CONVEY** unto the Trustee the following described property (the "Property") in trust, for the use and benefit of the Beneficiary:

(a)     the real property described in <u>Exhibit "A"</u> attached hereto and made a part hereof for all purposes, together with all of the easements, rights of way, privileges, hereditaments, strips and gores, streets, alleys, passages, ways, waters, watercourses, rights and appurtenances thereunto belonging or appertaining, and all of the estate, right, title, interest, claim or demand whatsoever of Grantor therein and in the streets and ways adjacent thereto, either in law or in equity (collectively, the "Land");

(b)     the structures or buildings, and all additions and improvements thereto, now or thereafter erected upon the Land, including all building materials and Fixtures (hereinafter defined) now or hereafter forming a part of said structures or buildings, or delivered to the Land and intended to be installed in such structures or buildings (collectively the "Improvements");

(c)     all systems, devices, machinery, apparatus, equipment, fittings, appliances and fixtures of every kind and nature whatsoever located on the Land or the Improvements, including, but not limited to, all electrical, anti-pollution, heating, lighting, laundry, incinerating, power, air-conditioning, plumbing, lifting, cleaning, fire prevention, fire extinguishing, refrigerating, ventilating, communication, garage and cooking systems, devices, machinery, apparatus, equipment, fittings, appliances and fixtures, and all engines, pipes, pumps, tanks, motors, conduits, ducts, compressors and switchboards, and all storm doors and windows, dishwashers, attached cabinets and partitions not included in the Improvements, but including any such systems, devices, machinery, apparatus, equipment, fittings, appliances and fixtures belonging to any tenant of the Land or Improvements unless they are necessary to the operation of the Improvements (collectively, the "Fixtures");

(d)     all articles of personal property of every kind and nature whatsoever, including, but not limited to, all shades, awnings, screens, furniture and carpets, now or hereafter affixed to, attached to, placed upon, used or usable in any way in connection with the use, enjoyment, occupancy or operation (including the planning, development and financing) of the Land or Improvements, but excluding any such articles of personal property belonging to any tenant of the Land or Improvements unless it is necessary to the operation of the Improvements (collectively, the "Personal Property");

(e)     all leases of the Land, Improvements and Personal Property, or any part thereof, now or hereafter entered into, and all right, title and interest of Grantor thereunder, including cash or securities deposited thereunder to secure performance by the tenants of their obligations, and, including further, the right to receive and collect the rents thereunder (collectively, the "Leases");

(f)     all revenues, income, rents, issues and profits of any of the Land, Improvements, Personal Property or Leases (collectively, the "Rents");

(g)     all proceeds from the conversion, whether voluntary or involuntary, of any part of the Land, Improvements or Personal Property into cash or liquidated claims, including insurance proceeds, insurance premium refunds and condemnation awards;

(h)     all contracts and subcontracts relating to the Land or Improvements and all permits, licenses, franchises, certificates and other rights and privileges obtained in connection with the Land or Improvements (collectively, the "Contracts"); and

(i)     all funds, accounts, contract rights, instruments, documents, general intangibles (including fictitious, trade and other names, trademarks and symbols used in connection with the Land or Improvements, whether registered or not), and notes and chattel paper arising from or by virtue of any transaction relating to the Land or Improvements or generated from business operations conducted thereon (collectively, the "Intangibles");

**TO HAVE AND TO HOLD** the Property unto the Trustee and the Trustee's successors and assigns forever.

## I.
## WARRANTIES, REPRESENTATIONS,
## COVENANTS AND OTHER AGREEMENTS

Grantor unconditionally warrants, represents, covenants and agrees that:

1.01. The Obligations contained in the Loan Documents are legal, valid and binding on Grantor and any guarantor, surety or endorser of Grantor, or other party (other than Grantor) directly or indirectly obligated, primarily or secondarily, for any portion of the Indebtedness or for the performance of any of the Obligations (collectively, the "Obligated Party") in accordance with their terms, and the execution and delivery of, and performance under, the Loan Documents: (i) are within Grantor's and the Obligated Party's powers and have been duly authorized by all requisite action; (ii) have received all requisite approval by any and all governmental or quasi-governmental entities of any nature whatsoever, whether federal, state, county, district, city or otherwise, and whether now or hereafter in existence (collectively, the "Governmental Authority"); and to the best of Grantor's

knowledge (iii) will not violate, conflict with, breach or constitute a default under any Legal Requirement (hereinafter defined) or result in the imposition of any lien, charge or encumbrance of any nature upon any of Grantor's assets, except as contemplated in the Loan Documents. As used herein, the term "Legal Requirement" shall mean any and all of the following that may now or hereafter be applicable to Grantor or the Property: (a) judicial decisions, statutes, rulings, rules, regulations, permits, certificates or ordinances of any Governmental Authority; (b) the Grantor's Articles of Organization and Regulations and any other agreements pertaining to the form of the Grantor's business; (c) the Leases; (d) the Contracts; (e) restrictions of record; and (f) other written or oral agreements or promises of any nature.

1.02. Grantor has good and indefeasible title to the Land, Improvements, Fixtures and Personal Property, free and clear of any liens, encumbrances, security interests or adverse claims, other than those exceptions described on Exhibit "B" attached hereto and made a part hereof for all purposes. This Deed of Trust shall constitute a valid and subsisting first lien on the Land, Improvements and Fixtures and a valid, subsisting, perfected and prior security interest in and to the Personal Property, Fixtures, Leases, Contracts and Intangibles, all in accordance with the terms of this Deed of Trust.

1.03. The Property forms no part of any property owned, used or claimed by Grantor as a residence or business homestead and is not exempt from forced sale under the laws of the State of Texas. Grantor hereby disclaims and renounces each and every claim to the Property as a homestead.

1.04. Grantor and any Obligated Party are now solvent and no bankruptcy or insolvency proceedings are pending or contemplated by or against any of them. All reports, statements and other data furnished by or on behalf of any of them to the Beneficiary are true and correct.

1.05. Grantor shall promptly and fully comply with all present and future Legal Requirements. All Improvements included or to be included in the Property comply or shall comply with all Legal Requirements.

1.06. Grantor and all Obligated Parties, as their interests appear and as the case may be, shall duly and punctually: (i) pay the Indebtedness as and when called for in the Loan Documents; (ii) perform all of the obligations, in full, on or before the dates they are to be performed; and (iii) cause each of the Impositions (as hereinafter defined) to be paid and discharged not later than the due dates thereof and furnish Beneficiary with evidence of such payment. As used herein, the term "Imposition" shall mean all rates and charges (including deposits), for taxes (for both real and personal property), water, gas, sewer, electricity, telephone and other utilities, any easement, license or agreement maintained for the benefit of the Property and all other charges, and any interest, costs or penalties with respect thereto of any nature whatsoever which may now or hereafter be assessed, levied or imposed upon the Property or the ownership, use, occupancy or enjoyment thereof (excluding insurance).

1.07. Grantor shall cause the Property to be maintained and operated in first-class order and condition and shall make all interior and exterior repairs, replacements, additions, improvements and alterations, both structural and non-structural, which are reasonably appropriate to keep them in such first-class order and condition.

1.08. Grantor shall keep the Property insured against fire, tornado, flood (if the Property is located in an identified "flood hazard area" in which flood insurance has been made available under the National Flood Insurance Program or under any subsequent Act of Congress of the United States of America), hail, explosion and such other risks, in such amounts and form as may be available or as reasonably required by Beneficiary pursuant to the Loan Agreement. In the event the Land shall now or hereafter be designated to lie within a special flood or mud slide hazard area designated by the Federal Emergency Management Agency or its successors, or any other governmental authority, Grantor shall secure and maintain, at its sole cost and expense, such flood insurance as may be available under said Act or through any private carrier, and in such amounts and form as may be available or as required by Beneficiary. All such policies shall have all losses made payable to Beneficiary by mortgagee clauses of standard form and shall contain written undertakings from such insurance companies to provide Beneficiary with at least thirty (30) days' written notice prior to the cancellation of any such policy. Such policies of insurance shall be delivered to Beneficiary promptly as issued. All renewal and substitute policies of insurance shall be delivered to the office of Beneficiary, with evidence of premiums paid, at least fifteen (15) days before the termination date of any existing policies. In case of loss, Beneficiary shall be entitled to receive and retain the proceeds of the insurance policies, applying the same, at its option, upon the Indebtedness or to apply such proceeds to the repair or restoration of the Improvements. If any loss shall occur at any time when Grantor shall be in default as to the performance of this Deed of Trust, Beneficiary shall nonetheless be entitled to the benefit of all insurance held by or for Grantor to the same extent as if it had been made payable to Beneficiary.

1.09. To insure the performance and discharge of Grantor's obligations under Sections 1.06 of this Article I, but not in lieu of such obligations, Grantor shall deposit with Beneficiary, either concurrently with the execution and delivery of this Deed of Trust or any time thereafter, a sum as estimated by Beneficiary for funding an escrow for payment of Impositions, including but not limited to, ad valorem taxes, assessments and charges against the Property. Grantor shall, deposit with Beneficiary on each date when an installment of interest or of principal and interest is due on the Note, sufficient funds (as estimated from time to time by Beneficiary) to permit Beneficiary to pay, at least fifteen (15) days prior to the due date thereof, the next maturing Impositions . If the amount so paid is not sufficient to pay such Impositions when due, then after notification by Beneficiary, Grantor shall deposit immediately with Beneficiary an amount sufficient to pay such Impositions. Any excess over the amounts required for such purposes shall, at Beneficiary's option, either be held by Beneficiary for future payment of such Impositions, or be refunded to Grantor. Beneficiary may, at its sole discretion, directly pay such Impositions in such manner and at such times as it may deem advisable; however, in no event shall Beneficiary be liable for any damages arising out of Beneficiary's manner or method of estimating or of making such payments. Beneficiary shall have no duty or liability to inquire as to the existence, necessity for, or making of any protest of said

**DEED OF TRUST, SECURITY AGREEMENT**
**AND ASSIGNMENT OF RENTS** - Page 5

Impositions.  If there is a default under any of the provisions of this Deed of Trust resulting in a foreclosure sale of the Property, or if Beneficiary otherwise acquires the Property after default, Beneficiary is hereby authorized and may, at its option, either apply at the time of commencement of such proceeding, or at the time the Property is otherwise acquired, any funds then accumulated in such escrow account as a credit against any amount then remaining unpaid of any Indebtedness in such order and manner as Beneficiary may elect.  No interest shall accrue or be allowed on any deposits made under the provisions of this Section 1.09 except as may be expressly required by law, and any such requirement of law is hereby expressly waived by Grantor to the extent permitted by law.  Beneficiary shall not be required to keep such deposits separate and apart, and may commingle such deposits with the general funds of Beneficiary.  Beneficiary shall not be required to account for or be liable to Grantor for any profits or benefits derived by Beneficiary from such deposits except as required by law.  In the event of a transfer, sale or conveyance by Grantor of the Property with the prior approval of Beneficiary, or effected by operation of law or by foreclosure of a subordinate lien, Grantor and Beneficiary hereby agree that all such deposits shall automatically, and without the necessity of notice or written assignment, be transferred and thereafter held by Beneficiary for the account of the new owner of the Property, whether such new owner is an individual or other entity, and such deposit shall thereafter be held, used, applied and governed in accordance with the foregoing.

1.10.  Grantor shall: (i) duly and punctually perform and comply with all representations, warranties, covenants and agreements binding upon it under the Leases; (ii) not voluntarily terminate or waive its rights under any of the Leases; (iii) use all reasonable efforts to maintain each of the Leases in force  and effect during the full term thereof; and (iv) appear in and defend any action or proceeding in any manner connected with any of the Leases.

1.11.  Grantor shall permit the Beneficiary and its agents, attorneys, representatives and employees, to enter upon and inspect the Property at all reasonable times and intervals.

1.12.  Grantor shall defend and hold Beneficiary harmless from any action, proceeding or claim affecting the Property or the Loan Documents or the lien or security interests created thereby.  Further, Grantor shall notify Beneficiary, in writing, promptly of the commencement of any legal proceedings affecting the Property, or any part thereof, and shall take such action as necessary to preserve Beneficiary's rights affected thereby, and Beneficiary may, at its election, take such action in behalf of and in the name of Grantor, and at Grantor's expense.

1.13.  Grantor shall promptly pay all debts and liabilities of any character, including, without limitation, all debts and liabilities for labor, material and equipment incurred in the construction, operation or development of the Property, and shall construct and repair all Improvements in a good and workmanlike manner.

1.14.  Grantor shall keep separate and proper books of record and account pertaining to the Property in accordance with sound accounting practices consistently applied (including without limitation, income and expense statements and cash flow statements accurately reflecting the operations of the Property), and cause to be reflected in its books, reserves for depreciation, depletion, obsolescence and amortization of the Property, as well as for the Impositions and other appropriate reserves, during such fiscal year, determined in accordance with sound accounting practices consistently applied.  Beneficiary shall have the right to examine the books of account of Grantor and to discuss the affairs, finances and accounts of Grantor with Grantor or any other party, all at such reasonable times and intervals as Beneficiary may desire.  Upon request from time to time and at any time, Grantor shall deliver to Beneficiary such certified financial statements, other financial reports, and tax returns as Beneficiary may require, including, without limitation, financial statements of Grantor, the Property or any Obligated Party.

1.15.  Upon request from time to time and at any time, Grantor shall promptly correct any defect, error or omission which may be discovered in the contents of this Deed of Trust or the Loan Documents, and shall execute and deliver any and all additional instruments as may be requested by Beneficiary to correct such defect, error or omission or to identify any additional properties which are or are to become subject to this Deed of Trust.

1.16.  Grantor shall give prompt  written notice to Beneficiary of any condemnation proceeding or casualty loss affecting the Property, and in each such instance afford Beneficiary an opportunity to participate in any such proceeding or in the settlement of any awards thereunder.

1.17.  Grantor shall promptly pay and hold Beneficiary harmless from all appraisal fees, recording fees, taxes, abstract fees, title policy fees, escrow fees, reasonable attorneys' fees and all other costs of every character incurred by Grantor or Beneficiary in connection with the closing of the loan evidenced by the Loan Documents, or the performance of the covenants of this Deed of Trust, or otherwise attributable or chargeable to Grantor as owner of the Property.

1.18.  Grantor shall not use or occupy, and shall use its best efforts to prohibit any use or occupancy of the Property in any manner which: (i) violates any Legal Requirement; (ii) may be dangerous; (iii) constitutes a public or private nuisance; or (iv) makes void or voidable any of the Leases, the Contracts or any insurance on the Property.

1.19.  Grantor shall not permit (i) any waste or deterioration of any part of the Property; (ii) any alterations or additions to the Property of a material nature; or (iii) any of the Fixtures or Personal Property to be removed at any time from the Land or Improvements unless the removed item is removed temporarily for maintenance and repair or, if removed permanently, is replaced by an article of at least equal suitability and value and owned by Grantor free and clear of any other lien or security interest.

1.20. Grantor shall not, without the prior written consent (such consent not to be unreasonably withheld) of Beneficiary: (i) create, place or permit to be created or placed, or allow to remain, any mortgage, pledge, lien (statutory, constitutional or contractual), security interest, encumbrance or charge, or conditional sale or other title retention agreement, regardless of whether same are expressly subordinate to the liens and security interests of the Loan Documents, with respect to the Property or any part thereof; or, (ii) sell, lease, exchange, assign, convey, transfer possession of or otherwise dispose of all or any portion of the Property, or any interest therein. Without limiting the right of Beneficiary to withhold its consent or to make other requirements prior to granting its consent, Beneficiary: (a) may require evidence satisfactory to Beneficiary that the transferee is creditworthy and has such management ability as Beneficiary shall deem in its sole discretion to be necessary; and (b) may require such transferee to execute such written modification and assumption agreements with regard to the Loan Documents as Beneficiary shall deem necessary or desirable, including, but not limited to, provisions increasing the interest rate on the Note, and payment of an assumption fee at the time of the proposed assumption. In the event ownership of the Property or any part thereof or interest therein becomes vested in any person or entity other than Grantor, Beneficiary or any other holder of the Indebtedness may, without notice to Grantor, deal with such successor or successors in interest with reference to this Deed of Trust and the Indebtedness in the same manner as with Grantor, without in any way discharging Grantor or any Obligated Party from the Indebtedness or the Obligations. No transfer of the Property, no forbearance by Beneficiary and no extension of the time for the payment of the Indebtedness or the performance of the Obligations granted by Beneficiary shall release, discharge or affect in any way Grantor's or any Obligated Party's liability hereunder.

1.21. Grantor agrees that the improvements shall at all times comply to the extent applicable with the requirements of the Americans With Disabilities Act of 1990, the Fair Housing Amendments Act of 1988, all state and local laws and ordinances related to handicapped access and all rules, regulations and orders pursuant thereto including without limitation, the Americans With Disabilities Act Accessibility Guidelines for Buildings and Facilities (collectively, "Access Laws"). Notwithstanding any provision set forth herein or any other document regarding Beneficiary's approval of alterations of the Improvements, Grantor shall not alter the Improvements in any manner which would increase Grantor's responsibilities for compliance with the applicable Access Laws without the prior written approval of Beneficiary. Beneficiary may condition any such approval upon receipt of a certificate of Access Law compliance from an architect, engineer or other person acceptable to Beneficiary. Grantor agrees to give prompt notice to Beneficiary of the receipt by Grantor of any complaints related to violation of any Access Laws and of the commencement of any proceedings or investigations which relate to compliance with applicable Access Laws.

## II.
## EVENTS OF DEFAULT

As used in this Deed of Trust, the term "Event of Default" shall mean the occurrence of any one or more of the following at any time and from time to time:

2.01. If any portion of the Indebtedness shall not be paid as and when the same shall become due and payable.

2.02. If any of the Obligations shall not be discharged fully and timely within fifteen (15) days following receipt of written notice from Beneficiary to Grantor of a failure to fully and timely discharge any of the Obligations.

2.03. If any representation, warranty or other information, including, without limitation, financial statements, marketing studies or cost estimates, supplied to Beneficiary are intentionally false, misleading or erroneous in any material respect.

2.04. If any Grantor or any Obligated Party shall: (i) voluntarily be adjudicated as bankrupt or insolvent; (ii) seek, consent to or not contest the appointment of a receiver or trustee for itself or for all or any part of its property; (iii) file a petition seeking relief under bankruptcy, arrangement, reorganization or other debtor relief laws of the United States or any state or any other competent jurisdiction; (iv) make a general assignment for the benefit of its creditors; or (v) admit in writing its inability to pay its debts as they mature.

2.05. If: (i) a petition is filed against any Grantor or any Obligated Party seeking relief under bankruptcy, arrangement, reorganization or other debtor relief laws of the United States or any state or other competent jurisdiction, which petition is not discharged within forty-five (45) days following the filing thereof; or (ii) a court of competent jurisdiction enters an order, judgment or decree appointing a receiver or trustee for any part of a Grantor's or an Obligated Party's property.

2.06. Except with the Beneficiary's prior written consent, if Grantor shall dissolve or liquidate, merge with or be consolidated into any other corporation, or Grantor shall transfer any portion of or interest in the Property, or shall attempt to do any of the same.

2.07. If the Property is abandoned, substantially damaged or threatened with substantial damage so that, in Beneficiary's reasonable judgment, it cannot promptly be restored with available funds (or funds forthcoming from claims made pursuant to an applicable insurance policy) to a profitable condition.

2.08. If the holder of any lien or security interest on the Property (notwithstanding that the creation of the same may constitute a separate default hereunder) institutes foreclosure or other proceedings for the enforcement of its remedies thereunder.

2.09. If any condemnation proceeding is instituted or threatened which would, in Beneficiary's sole judgment, materially impair the use or enjoyment of the Property for its intended purposes.

## III.
## DEFAULT AND FORECLOSURE

To the fullest extent permitted in equity or at law, by statute or otherwise:

3.01. If an Event of Default shall occur, Beneficiary may, at Beneficiary's sole election, exercise any or all of the following:

(a)    Declare all unpaid amounts under the Note and any other unpaid portion of the Indebtedness immediately due and payable, without further notice, presentment, protest, demand or action of any nature whatsoever (each of which is hereby expressly waived by Grantor), whereupon the same shall become immediately due and payable.

(b)    Enter upon the Property and take exclusive possession thereof and of all books, records and accounts relating thereto, and, if necessary to obtain such possession, Beneficiary may invoke any and all legal remedies to dispossess Grantor, including specifically one or more actions for forcible entry and detainer, trespass to try title and writ of restitution.

(c)    Hold, lease, manage, operate or otherwise use or permit the use of the Property, either by itself or by other persons, firms or entities, in such manner, for such time and upon such other terms as Beneficiary may deem prudent under the circumstances (making such repairs, alterations, additions and improvements thereto and taking such other action from time to time as Beneficiary shall deem necessary or desirable), and apply all Rents collected in connection therewith in accordance with the provisions of Section 3.07.

(d)    Sell or offer for sale the Property in such portions, order and parcels as Beneficiary may determine, with or without having first taken possession of same, to the highest bidder for cash at public auction. Such non-judicial sale shall be conducted during a three hour period between the hours of 10:00 o'clock a.m. and 4:00 o'clock p.m. (the earliest time of commencement of which shall be specified in the notice of sale) on the first Tuesday of any month, at the area officially designated for holding such non-judicial foreclosure sales at the courthouse of any county in the State of Texas in which any part of the Property is situated, after giving adequate legal notice of the time, place and terms of sale, by posting or causing to be posted written or printed notices thereof for at least twenty-one (21) consecutive days preceding the date of said sale at the courthouse door of the foregoing county, and if the Land is situated in more than one county, one notice shall be posted at the courthouse door of each county in which the Land is situated, and filing a copy of such notice in the office of the county clerk of each county in which the Land is located. Beneficiary shall serve written notice of such non-judicial foreclosure sale on each person obligated to pay

the Indebtedness at least twenty-one (21) days preceding the date of such sale by certified mail at the most recent address for such parties in the records of Beneficiary, or by accomplishing all or any of the aforesaid in such manner as permitted or required by Section 51.002, as amended, of the Texas Property Code of the State of Texas (as now written or as hereafter amended or succeeded) relating to the sale of real estate and/or by Chapter 9 of the Texas Business and Commerce Code (the "Code") relating to the sale of collateral after default by a debtor, or by any other present or subsequent laws. Service of such notice by certified mail shall be completed upon deposit of such notice, postage-prepaid, properly addressed to such person or entity at a post office of the United States Postal Service or in an official depository under the care and custody of the United States Postal Service. The affidavit of a person knowledgeable of the facts to the effect that such service was completed shall be prima facie evidence of the fact of service. At any such sale: (i) the Trustee or any substitute trustee shall not be required to have physical or constructive possession of the Property (Grantor hereby covenanting and agreeing to deliver to Trustee or any substitute trustee any portion of the Property not actually or constructively possessed by Trustee or any substitute trustee immediately upon demand by Trustee or any substitute trustee) and the title to and right of possession of any such property shall pass to the purchaser thereof as completely as if the same had been actually present and delivered to the purchaser at such sale; (ii) each instrument of conveyance executed by Trustee or any substitute trustee shall contain a general warranty of title binding upon Grantor; (iii) each and every recital contained in any instrument of conveyance made by Trustee or any substitute trustee shall conclusively establish the truth and accuracy of the matters recited therein, including, without limitation, nonpayment of the Indebtedness, advertisement and conduct of such sale in the manner provided herein and otherwise by law and by appointment of any successor Trustee hereunder; (iv) any and all prerequisites to the validity of such sale shall be conclusively presumed to have been performed; (v) the receipt of the Trustee or such other party making the sale shall be a sufficient discharge to the purchaser for his purchase money and no such purchaser, or his assigns or personal representatives, shall thereafter be obligated to see to the application of such purchase money or be in any way answerable for any loss, misapplication or non-application thereof; (vi) Grantor shall be completely and irrevocably divested of all of its right, title, interest, claim and demand whatsoever, either at law or in equity, in and to all or any part of the Property sold, and such sale shall be a perpetual bar both at law and in equity against Grantor and against any and all other persons claiming or to claim the Property sold or any part thereof; and (vii) Beneficiary may be a purchaser at any such sale.

(e) Upon or at any time after commencement of foreclosure of the lien and security interest provided for herein, or any legal proceedings hereunder, Beneficiary may make application to a court of competent jurisdiction, as a matter of strict right and without notice to Grantor or regard to the adequacy of the Property for the repayment of the Indebtedness, for the appointment of a receiver of the Property, and Grantor does hereby irrevocably consent to such appointment. Any such receiver shall have all the usual powers and duties of receivers in similar cases.

(f) Exercise any and all other rights, remedies and recourses granted under the Loan Documents or as may be now or hereafter existing in equity or at law, by virtue of statute or otherwise.

3.02. Should the Property be sold in one or more parcels as permitted by Section 3.01(d) the right of sale arising out of any Event of Default shall not be exhausted by any one or more such sales, but other and successive sales may be made until all of the Property has been sold or until the Indebtedness has been fully satisfied.

3.03. All rights, remedies and recourses of Beneficiary granted in the Loan Documents, or otherwise available at law or equity: (i) shall be cumulative and concurrent; (ii) may be pursued separately, successively or concurrently against Grantor or any Obligated Party, or against the Property, or against any one or more of them, at the sole discretion of Beneficiary; (iii) may be exercised as often as the occasion therefore shall arise, it being agreed by Grantor that the exercise or failure to exercise any of same shall in no event be construed as a waiver or release thereof or of any right, remedy or recourse; and (v) shall be nonexclusive.

3.04. Beneficiary may release, regardless of consideration, any part of the Property without, as to the remainder, in any way impairing, affecting, subordinating or releasing the lien or security interests evidenced by the Loan Documents or affecting the obligations of Grantor or any Obligated Party to pay or perform, as their interests may appear, the Indebtedness or Obligations. Beneficiary may release any Obligated Party from its obligation to pay or perform the Indebtedness or the Obligations without in any way thereby releasing any other Obligated Party or the Grantor. Beneficiary may resort to any of the security for payment of the Indebtedness in such order and manner as Beneficiary may elect. No security heretofore, herewith or subsequently taken by Beneficiary shall in any manner impair or affect the security given by the Loan Documents, and all security shall be taken, considered and held as cumulative.

3.05. Grantor hereby irrevocably and unconditionally waives and releases: (i) all benefits that might accrue to Grantor by virtue of any present or future law exempting the Property from attachment, levy or sale on execution or providing for any appraisement, valuation, stay of execution, exemption from civil process, redemption or extension of time for payment; and (ii) any right to a marshaling of assets or a sale in inverse order of alienation.

**DEED OF TRUST, SECURITY AGREEMENT
AND ASSIGNMENT OF RENTS** - Page 12
█████████████████████

3.06. In case Beneficiary shall have proceeded to invoke any right, remedy or recourse permitted under the Loan Documents and shall thereafter elect to discontinue or abandon same for any reason, Beneficiary shall have the unqualified right so to do and, in such event, Grantor and Beneficiary shall be restored to their former positions with respect to the Indebtedness, the Obligations, the Loan Documents and the Property, and the rights, remedies, recourses and powers of Beneficiary shall continue as if same had never been invoked.

3.07. Any proceeds of any sale of, and any rents or other amounts generated by the holding, leasing, operation or other use of the Property shall be applied in the following order of priority: (i) first, to the payment of all costs and expenses of taking possession of the Property and of holding, leasing, operating, using, repairing, improving and selling the same, including, without limitation, reasonable attorney's and fees of the Trustee retained by the Beneficiary or Trustee : fees of any receiver or accountants; recording and filing fees; court costs, costs of advertisement; the payment of any and all Impositions, liens, security interests or other rights, title or interests equal or superior to the lien and security interest of this Deed of Trust (except those to which the Property has been sold subject to and without in any way implying the Beneficiary's consent to the creation thereof): (ii) second, to the payment of all accrued and unpaid interest due on the Note; (iii) third, to the payment of the unpaid principal balance of the Note; (iv) fourth, to the payment of all amounts, other than unpaid principal and accrued interest on the Note, which may be due to the Beneficiary under the Loan Documents, together with interest thereon as provided therein; (v) fifth, to the payment of unpaid Indebtedness; and (vi) sixth, to the Grantor.

3.08. Any foreclosure sale of the Property under this Deed of Trust shall, without further notice, create the relation of landlord and tenant at sufferance between the purchaser at such sale as landlord, and Grantor (and any other party in possession), as tenant; and upon failure to surrender possession after demand, Grantor may be removed by forcible entry and detainer action or by a writ of possession upon suit by such purchaser. Upon conclusion of any foreclosure sale, all right, title and interest of Grantor in all utility service accounts in connection with the Property, and in deposits in connection therewith shall past to and vest in the purchaser at any such foreclosure sale of the Property.

3.09. In addition to the remedies set forth in this Article III, upon the occurrence of any Event of Default, the Beneficiary shall, in addition, have available to them the remedies set forth in Articles IV and V herein, as well as all other remedies available to them at law or in equity.

## IV.
## SECURITY AGREEMENT

Grantor hereby grants to Beneficiary a security interest in and to the Personal Property, Fixtures, Leases, Contracts and Intangibles (collectively, the "Collateral") as follows:

4.01. This Deed of Trust shall also constitute and serve as a "Security Agreement" on personal property within the meaning of, and shall constitute a first and prior security interest under Chapter 9 of the Code with respect to the Collateral. To this end, Grantor has Granted, Bargained, Conveyed, Assigned, Transferred and Set Over unto the Beneficiary as a secured party, a first and prior security interest in all of Grantor's right, title and interest in, to and under the Collateral, and all proceeds from the sale, lease or other disposition of the Collateral, in trust, to secure the full and timely payment of the Indebtedness and performance of the Obligations.

4.02. Grantor agrees to execute and deliver to Beneficiary, in form and substance satisfactory to Beneficiary, such financing statements and such further assurances as Beneficiary may from time to time consider necessary to create, perfect and preserve the security interest herein granted. Beneficiary may cause such statements and assurances to be recorded and filed at such times and places as may be required or permitted by law to create, perfect and preserve such security interest.

4.03. Beneficiary shall have all the rights, remedies and recourses with respect to the Collateral afforded a "Secured Party" by Chapter 9 of the Code, in addition to, and not in limitation of, the other rights, remedies and recourses afforded Beneficiary by this Deed of Trust and the Loan Documents.

4.04. The security interest herein granted shall not be deemed or construed to constitute Beneficiary as a party in possession of the Collateral, to obligate Beneficiary to lease the Property or to take any action, incur any expenses or perform any obligation whatsoever under any of the Leases or otherwise.

4.05. Upon the occurrence of any Event of Default as provided in Article III of this Deed of Trust, and at any time thereafter:

(a)    Beneficiary shall have, with regard to the Collateral, the remedies provided in this Deed of Trust and in the Code (no such remedy granted by the Code being excepted, modified or waived herein). Beneficiary may use its discretion in exercising the rights and electing the remedies; provided, however, all acts shall be in compliance with the standards of the Code, where applicable and required. For purposes of the notice requirements of the Code and this Article IV, it is agreed that notice sent or given not less than five (5) business days prior to the taking of the action to which the notice relates is reasonable notice.

(b)    Beneficiary shall be entitled, acting in their sole discretion, to apply the proceeds of any disposition of the Collateral in the order set forth in Chapter 9 of the Code, or, if allowed by the Code, in the order set forth in Section 3.07 hereof.

(c)     To the extent permitted by law and without limiting any rights and privileges herein granted to Beneficiary, Beneficiary may, at its option, sell and dispose of any and all of the Collateral at the same time and place and in the same manner as the non-judicial foreclosure sale provided under the terms and conditions of this Deed of Trust, after giving notice as provided for in this Deed of Trust of such non-judicial foreclosure sale of the Property. Such notice shall be deemed to include notice of sale of the Collateral whether or not specifically set forth therein. Beneficiary hereby appoints Trustee, or any substitute trustee, in trust, as its agent for the sale of the Collateral to be conducted in conjunction with any non-judicial foreclosure sale of the Property.

4.06. Beneficiary may require Grantor to assemble and make the Collateral available to Beneficiary at a place to be designated by Beneficiary that is reasonably convenient to both parties. All expenses of retaking, holding, preparing for sale, lease or other use or disposition, selling, leasing or otherwise using or disposing of the Collateral and the like which are incurred or paid by Beneficiary as authorized or permitted hereunder, including all attorneys' fees, legal expenses and costs, shall be added to the Indebtedness and Grantor shall be liable therefor.

4.07. This Deed of Trust shall be effective as a financing statement to the Collateral when filed for record in the Deed of Trust Records of any county in which any portion of the Land is located. The record owner of the Land is Grantor, whose mailing address for purposes of such financing statement is set forth in the first page of this Deed of Trust. Information concerning the security interest created by this instrument may be obtained from Beneficiary at its address on the first page of this Deed of Trust.

## V.
## ASSIGNMENT OF RENTS

Grantor does hereby absolutely and unconditionally assign, transfer and convey to Beneficiary all Rents under the following provisions:

5.01. Grantor may, as Beneficiary's licensee, unless and until an Event of Default occurs under this Deed of Trust, collect the Rents or other sums payable by virtue of the Leases.

5.02. Upon the occurrence of an Event of Default, Beneficiary may terminate Grantor's license to collect the Rents, and in its own name sue for or otherwise collect the Rents. Grantor agrees that the other parties under the Leases may, upon notice from Beneficiary of the occurrence of an Event of Default, thereafter pay direct to Beneficiary the Rents due and to become due under the Leases and attorn to all other obligations thereunder direct to Beneficiary without any obligation on their part to determine whether an Event of Default does in fact exist or has in fact occurred. All Rents collected by Beneficiary shall be applied as provided for in Section 3.07 above; provided, however, that if the costs, expenses and attorneys' fees shall exceed the amount of Rents collected,

the excess shall be added to the Note, shall bear interest as provided in Section 8.06 below and shall be immediately due and payable. The entering upon and taking possession of the Property, the collection of Rents and the application thereof as aforesaid shall not cure or waive any Event of Default or notice of default, if any, hereunder, nor invalidate any act done pursuant to such notice, except to the extent any such default is fully cured. Failure or discontinuance of Beneficiary at any time or from time to time, to collect the Rents shall not in any manner impair the subsequent enforcement by Beneficiary of the right, power and authority herein conferred. Nothing contained herein, nor the exercise of any right, power of authority herein granted to Beneficiary shall be or be construed to be an affirmation by it of any tenancy, lease or option nor an assumption of liability under nor the subordination of the lien or charge of this Deed of Trust to any such tenancy, lease or option.

5.03. Grantor shall not: (i) execute an assignment of any right, title or interest in the Rents; or (ii) except where the lessee is in default thereunder, terminate or consent to the cancellation or surrender of any Lease, now or hereafter existing, except that any Lease may be canceled provided that promptly after the cancellation or surrender thereof a new Lease is entered into with a new lessee having a credit standing, in the judgment of Beneficiary, at least equivalent to that of the lessee whose Lease was canceled, on substantially the same terms as the terminated or canceled Lease; or (iii) modify any Lease or any part thereof so as to shorten the unexpired term thereof or so as to decrease the amount of the Rents; or (iv) accept prepayment of any Rents in excess of one month, except prepayments in the nature of security for the performance of the lessee under any Lease; or (v) in any other manner impair the value of the Property or the security of this Deed of Trust. Grantor shall not execute any Lease of all or any substantial portion of the Property, except for actual occupancy by the lessee thereunder, and shall at all times promptly and faithfully perform, or cause to be performed, each covenant, condition and agreement contained in each Lease, now or hereafter existing, on the part of lessor thereunder to be kept and performed. Grantor shall furnish to Beneficiary, within ten (10) days after a request by Beneficiary to do so, a written statement containing the names of all lessees of the Property, the terms of their respective Leases, the spaces occupied and the rentals payable thereunder.

## VI.
## THE TRUSTEE

The following provisions shall govern with respect to the Trustee:

6.01. Trustee shall not be liable for any error of judgment or act done by Trustee in good faith, or be otherwise responsible or accountable to Grantor under any circumstances whatsoever, nor shall Trustee be personally liable, in case of entry by him or her or anyone entering by virtue of the powers herein granted upon the Property, for debts contracted or liability or damages incurred in the management or operation of the Property. Trustee shall have the right to rely on any instrument, document or signature authorizing or supporting any action taken or proposed to be taken by the Trustee hereunder, believed by the Trustee in good faith to be genuine. Trustee shall be

entitled to reimbursement for expenses incurred by him or her in the performance of his or her duties hereunder and to reasonable compensation for such of his or her services hereunder as shall be rendered. Grantor shall, from time to time, pay the compensation due to Trustee hereunder and reimburse Trustee for, and save him or her harmless from and against, any and all liability and expenses which may be incurred by him or her in the performance of his or her duties.

6.02. All moneys received by Trustee shall, until used or applied as herein provided, be held in trust for the purposes for which they were received, but need not be segregated in any manner from any other moneys (except to the extent required by law). Trustee shall be under no liability for interest on any money received by him or her hereunder.

6.03. Trustee may resign at any time with or without notice. If Trustee shall die, resign or become disqualified from acting in the execution of this trust or shall fail or refuse to execute the same when requested by Beneficiary so to do, or if, for any reason, Beneficiary shall prefer to appoint a substitute trustee to act instead of the aforenamed Trustee, Beneficiary shall have full power to appoint a substitute trustee and, if preferred, several substitute trustees in succession who shall succeed to all the estates, rights, powers and duties of the aforenamed Trustee.

6.04. Any new Trustee appointed pursuant to any of the provisions hereof shall, without any further act, deed or conveyance, become vested with all the estates, properties, rights, powers and trusts of his or her predecessor in the rights hereunder with like effect as if originally named as Trustee herein; but nevertheless, upon the written request of Beneficiary or of the successor Trustee, the Trustee ceasing to act shall execute and deliver an instrument transferring to such successor Trustee, upon the trusts herein expressed, all the estates, properties, rights, powers and trusts of the Trustee so ceasing to act, and shall duly assign, transfer and deliver any of the property and money held by such Trustee to the successor Trustee so appointed in his or her place.

## VII.
## ENVIRONMENTAL PROVISIONS

7.01. For the purpose of this Deed of Trust, Grantor and Beneficiary agree that, unless the context otherwise specifies or requires, the following terms shall have the meaning herein specified:

    (a)    "Hazardous Materials" shall mean any substance the presence of which on the Property is regulated by any Governmental Requirements (as hereinafter defined), including but not limited to: (i) any "hazardous waste" as defined by the Resource Conservation and Recovery Act of 1976 (42 U.S.C. Section 6901 et seq.), as amended from time to time, and regulations promulgated thereunder; (ii) any "hazardous substance" as defined by the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. Section 9601 et seq.) ("CERCLA" or "Superfund"), as amended from time to time, and regulations promulgated thereunder; (iii) asbestos; (iv) polychlorinated biphenyls; (v) any

**DEED OF TRUST, SECURITY AGREEMENT**
**AND ASSIGNMENT OF RENTS** - Page 17

petroleum-based products, except petroleum-based products utilized and maintained in compliance with all applicable Governmental Requirements; and (vi) underground storage tanks, except underground storage tanks operated and maintained in compliance with all applicable Governmental Requirements.

(b)     "Governmental Requirements" shall mean all laws, ordinances, statutes, codes, rules, regulations, orders and decrees of the United States of America, the state, the county, the city, or any other political subdivision in which the Property is located, and any other political subdivision, agency or instrumentality exercising jurisdiction over Grantor or the Property.

(c)     "Hazardous Materials Contamination" shall mean the contamination (whether presently existing or hereafter occurring) of the Improvements, facilities, soil, groundwater, air or other elements on, over or under, the Property by Hazardous Materials, or the contamination of the Improvements, facilities, soil, groundwater, air or other elements on, under any other property as a result of Hazardous Materials at any time (whether before or after the date of this Deed of Trust) emanating from the Property.

7.02. Grantor hereby represents and warrants that to the best of its knowledge:

(a)     No Hazardous Materials (except incidental products utilized in Grantor's business) are located on the Property or have been released into the environment, or deposited, discharged, placed or disposed of at, on, under or near the Property, or transported to or from the Property. No portion of the Property is being used or has been used at any previous time, for the disposal, storage, treatment, processing, manufacturing or other handling of Hazardous Materials nor is any part of the Property affected by any Hazardous Materials Contamination.

(b)     (i) No Hazardous Materials are located on property adjoining the Property; (ii) no property adjoining the Property has ever been used at any previous time for the disposal, storage, treatment, processing, manufacturing or other handling of Hazardous Materials,; and (iii) no property adjoining the Property is affected by Hazardous Materials Contamination.

(c)     No asbestos or asbestos-containing materials have been installed, used, incorporated into, or disposed of on the Property.

(d)     No polychlorinated biphenyls or materials containing polychlorinated biphenyls are located on or in the Property, in the form of electrical transformers, fluorescent light fixtures with ballasts, cooling oils, or any other device or form.

(e)     No investigation, administration order, consent order, agreement, litigation or settlement with respect to Hazardous Materials or Hazardous Materials Contamination is proposed, threatened, anticipated or in existence with respect to the Property. The Property and its existing and prior uses comply and at all times have complied with any applicable Governmental Requirements relating to environmental matters or Hazardous Materials. There is no condition on the Property which is in violation of any applicable Governmental Requirements relating to Hazardous Materials, and Grantor has received no communication from or on behalf of any governmental authority that any such condition exists. The Property is not currently on, and to the best of Grantor's knowledge, has never been on, any federal, state or local "Superfund" or "Superlien" list.

(f)     Except for studies, audits, and reports pertaining to the Property which have been made available to Beneficiary, there have been no environmental investigations, studies, audits, tests, reviews or other analyses conducted by or which are in the possession of or available to Grantor in relation to the Property.

(g)     All representations and warranties contained in this Section 7.02 shall survive the consummation of the transactions contemplated by this Deed of Trust.

7.03. Grantor agrees: (a) that Grantor shall not receive, store, dispose or release any Hazardous Materials on or to the Property or transport any Hazardous Materials to or from the Property or permit the existence of any Hazardous Materials Contamination; (b) to give written notice to Beneficiary immediately upon Grantor's acquiring knowledge of the presence of any Hazardous Materials on the Property or of the transport of any Hazardous Materials to or from the Property or of the existence of any Hazardous Materials Contamination, with a full description thereof; (c) promptly, at Grantor's sole cost and expense, to comply with any Governmental Requirements requiring the removal, treatment or disposal of such Hazardous Materials or Hazardous Materials Contamination and provide Beneficiary with satisfactory evidence of such compliance; (d) to provide Beneficiary, within thirty (30) days after demand by Beneficiary, with financial assurance evidencing to Beneficiary's satisfaction that the necessary funds are available to pay the cost of removing, treating and disposing of such Hazardous Materials or Hazardous Materials Contamination and discharging any assessments which may be established on the Property as a result thereof; and (e) to insure that all leases, licenses, and agreements of any kind now or hereafter executed which permit any party to occupy, possess, or use in any way the Property or any part thereof, whether written or oral, include an express prohibition on the disposal or discharge of any Hazardous Materials at or affecting the Property, and a provision that failure to comply with such prohibition shall expressly constitute a default under any such agreement.

7.04. Grantor shall not cause or suffer any liens to be recorded against the Property as a consequence of, or in any way related to, the presence, remediation or disposal of Hazardous Materials in or about the Property, including any so-called state, federal or local "Superfund" lien relating to such matters.

DEED OF TRUST, SECURITY AGREEMENT
AND ASSIGNMENT OF RENTS - Page 19
█████████████

7.05. Beneficiary may upon (by its officers, employees and agents) the occurrence of an Event of Default, or if Beneficiary reasonably believes there has occurred a violation of any applicable Governmental Requirements, contract for the service of persons (the "Site Reviewers") to perform environmental site assessments ("Site Assessments") on the Property for the purpose of determining whether there exists on the Property any environmental condition which could result in any liability, cost or expense to the owner, occupier or operator of such Property arising under any Governmental Requirements relating to Hazardous Materials. The Site Assessments may be performed upon reasonable notice, and under reasonable conditions established by Grantor which do not impede the performance of the Site Assessment. The Site Reviewers are hereby authorized to enter upon the Property for such purposes. The Site Reviewers are further authorized to perform both above and below-ground testing for environmental damage or the presence of Hazardous Materials or Hazardous Materials Contamination on the Property and such other tests on the Property as may be necessary to conduct the Site Assessments in the reasonable opinion of the Site Reviewers. Grantor shall supply to the Site Reviewers such historical and operational information regarding the Property as may be reasonably requested by the Site Reviewers to facilitate the Site Assessments and shall make available for meetings with the Site Reviewers appropriate personnel having knowledge of such matters. On request, Beneficiary shall make the results of such Site Assessments fully available to Grantor, which (prior to an Event of Default) may at its election participate under reasonable procedures in the direction of such Site Assessments and the description of tasks of the Site Reviewers. The cost of performing up to two (2) Site Assessments during the term of the Note shall be paid by Grantor upon demand of Beneficiary and any such obligations shall be Indebtedness secured by this Deed of Trust.

7.06. Grantor shall at all times retain any and all liabilities arising from the presence, handling, treatment, storage, transportation, removal or disposal of Hazardous Materials on the Property during Grantor's ownership. Regardless of whether any Site Assessments are conducted hereunder, and regardless of whether any Event of Default (as defined in Section 2.01 of this Deed of Trust) shall have occurred and be continuing or any remedies in respect to the Property are exercised by Beneficiary, Grantor shall defend, indemnify and hold harmless Beneficiary and Trustee (and any successor trustee) from and against any and all liabilities (including strict liability), suits, actions, claims, demands, penalties, damages (including, without limitation, lost profits, consequential damages, interest, penalties, fines and monetary sanctions), losses, costs and expenses (including, without limitation, reasonable attorneys' fees and remedial costs) (the foregoing are hereinafter collectively referred to as "Liabilities") which may now or in the future (whether before or after the culmination of the transactions contemplated by this Deed of Trust) be incurred or suffered by Beneficiary or Trustee (or any successor trustee) by reason of, resulting from, in connection with, or arising in any manner whatsoever out of the breach of any warranty or covenant or the inaccuracy of any representation of Grantor contained or referred to in this Article VII or in any loan agreement made and entered into between Grantor and Beneficiary relating to the Property or which may be asserted as a direct or indirect result of the presence on or under, or escape, seepage, leakage, spillage, discharge, emission or release from the Property (during Grantor's ownership) of any Hazardous Materials or any Hazardous Materials Contamination or arise out of or result from the environmental condition of the Property or the applicability of any Governmental Requirements

relating to Hazardous Materials, regardless of whether or not caused by or within the control of Grantor, except to the extent caused by Beneficiary.

Such Liabilities shall include, without limitation: (i) injury or death to any person; (ii) damage to or loss of the use of any property; (iii) the cost of any demolition and rebuilding of any Improvements now or hereafter situated on the Property or elsewhere, and the cost of any repair or remediation of any such Improvements; (iv) the cost of any activity required by any governmental authority; (v) any lawsuit brought or threatened, good faith settlement reached, or governmental order relating to the presence, disposal, release or threatened release of any Hazardous Materials, on, from or under the Property; and (vi) the imposition of any liens on the Property arising from the activity of Grantor or Grantor's predecessors in interest on the Property or from the existence of Hazardous Materials upon the Property or Hazardous Materials Contamination during Grantor's ownership of the Property. The covenants, warranties, agreements and indemnifications contained in this Article VII shall survive the consummation of the transactions contemplated by this Deed of Trust.

7.07. Right of Entry. Beneficiary shall have the right but not the obligation, without in any way limiting Beneficiary's other rights and remedies under this Deed of Trust, to enter onto the Property or to take such other actions as it deems necessary or advisable to clean up, remove, resolve or minimize the impact of, or otherwise deal with, any Hazardous Materials or Hazardous Materials Contamination on or under the Property following receipt of any notice from any person or entity asserting the existence of any Hazardous Materials or Hazardous Materials Contamination pertaining to the Property, or any part thereof which, if true, could result in an order, notice, suit, imposition of a lien on the Property, or other action, and/or which, in Beneficiary's sole opinion, could jeopardize Beneficiary's security upon this Deed of Trust. All costs and expenses paid or incurred by Beneficiary in the exercise of any such rights shall be indebtedness secured by this Deed of Trust and shall be payable by Grantor upon demand.

## VIII.
## MISCELLANEOUS

The following provisions shall also apply to and govern this Deed of Trust and the interpretation hereof:

8.01. All judgments, decrees or awards now or hereafter made for injury or damage to the Property, or awards, settlements or other compensation now or hereafter made by any Governmental Authority, including those for any variation of, or change of grade in, any streets affecting the Land or the Improvements, are hereby assigned in their entirety to Beneficiary, who may apply the same to the Indebtedness secured hereby in such manner as Beneficiary may elect; and Beneficiary is hereby authorized, in the name of Grantor, to execute and deliver valid acquitances for, and to appeal from, any such award, judgment or decree.

DEED OF TRUST, SECURITY AGREEMENT
AND ASSIGNMENT OF RENTS - Page 21

8.02. Each and all of the Obligations shall survive the execution and delivery of the Loan Documents and the consummation of the loan called for therein, and shall continue in full force and effect until the Indebtedness shall have been paid in full.

8.03. Grantor, upon the request of Beneficiary, shall execute, acknowledge, deliver and record and/or file such further instruments and do such further acts as may be necessary, desirable or proper to carry out more effectively the purposes of the Loan Documents and to subject to the liens and security interests thereof any property intended by the terms thereof to be covered thereby, including specifically, but without limitation, any renewals, additions, substitutions, replacements or appurtenances to the Property. Grantor shall pay all such recording, filing, re-recording and re-filing taxes, fees and other charges, including those for security interest searches.

8.04. All notices or other communications required or permitted to be given under this Deed of Trust [except for notices of a foreclosure sale which shall be given in the manner set forth in Section 3.01(d) hereof] shall be in writing and shall be deemed served and given upon deposit in the United States mail, postage prepaid, registered or certified with return receipt requested, or by delivering same in person to the intended addressee. Notice given in any other manner shall be effective only if and when received by the addressee. For purposes of notice, the addresses of the parties shall be as set forth on the first page of this Deed of Trust; provided, however, that either party shall have the right to change its address for notice hereunder to any other location within the continental United States by the giving of ten (10) days' notice to the other party in the manner set forth hereinabove.

8.05. Any failure by Beneficiary to insist, or any election by Beneficiary not to insist, upon strict performance by Grantor of any of the terms, provisions or conditions of the Loan Documents shall not be deemed to be a waiver of same or of any other term, provision or condition thereof, and Trustee and Beneficiary shall have the right at any time or times thereafter to insist upon strict performance by Grantor of any and all of such terms, provisions and conditions.

8.06. If Grantor shall fail, refuse or neglect to make any payment or perform any act required by the Loan Documents, then at any time thereafter, and without notice to or demand upon Grantor (except as otherwise provided in the Loan Documents), and without waiving or releasing any other right, remedy or recourse Beneficiary may have, Beneficiary may (but shall not be obligated to) make such payment or perform such act for the account of and at the expense of Grantor, and shall have the right to enter the Land and Improvements for such purpose and to take all such action thereon and with respect to the Property as it may deem necessary or appropriate. Grantor shall indemnify Beneficiary for all losses, expenses, damages, claims and causes of action, including reasonable attorneys' fees, incurred or accruing by reason of any acts performed by Beneficiary pursuant to this Section 8.06, and all such sums expended by Beneficiary to which it shall be entitled to be indemnified, together with interest thereon at the maximum rate allowed by law from the date of such payment or expenditure until paid, shall constitute additions to the Indebtedness, shall be secured by the Loan Documents and shall be paid by Grantor to Beneficiary upon demand.

8.07. All obligations are intended by the parties to be, and shall be construed as, covenants running with the Property.

8.08. All of the terms of the Loan Documents shall apply to, be binding upon and inure to the benefit of the parties thereto, their respective successors, assigns, heirs and legal representatives, and all other persons claiming by, through or under them.

8.09. The Loan Documents are intended to be performed in accordance with, and only to the extent permitted by, all applicable Legal Requirements. If any provision of the Loan Documents or the application thereof to any person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, neither the remainder of the instrument in which such provision is contained, nor the application of such provision to other persons or circumstances, nor the other instruments referred to hereinabove shall be affected thereby, but rather shall be enforced to the greatest extent permitted by law. Notwithstanding anything to the contrary contained in any of the Loan Documents, whether now existing or hereafter arising and whether written or oral, it is agreed that the aggregate of all interest and any other charges constituting interest, or adjudicated as constituting interest, and contracted for, chargeable or receivable under the Note or otherwise in connection with this loan transaction, shall under no circumstances exceed the total amount of interest which would have been earned at the Maximum Rate (hereinafter defined). As used herein, the term "Maximum Rate" means the maximum non-usurious interest rate that at any time or from time to time may be contracted for, taken, reserved, charged or received on the indebtedness evidenced by the Note under the laws of the United States of America or the State of Texas which are presently in effect, or which may hereafter be in effect and which allow a higher maximum non-usurious interest rate than that which is now allowed. In the event the maturity of the Note is accelerated by the Beneficiary as a result of a default under the Note, this Deed of Trust or under any of the other Loan Documents, or by voluntary prepayment of the Note by the Grantor, or otherwise, then the total amount of earned interest may never exceed the total amount of interest which would have been earned at the Maximum Rate, computed form the dates each advance of the loan proceeds is made until payment. If, from any circumstance, the Beneficiary shall ever receive interest, or any other charges constituting interest, or adjudicated as constituting interest, in excess of the total amount of interest which would have been earned at the Maximum Rate, the amount of such excess interest shall be applied to the reduction of the principal amount owing on the Note or on account of any other principal indebtedness of the Grantor to the Beneficiary, and not to the payment of interest; or if the amount of such excess interest exceeds the unpaid principal balance of the Note and such other indebtedness, the amount of such excess interest that exceeds the unpaid principal balance of the Note and such other indebtedness shall be refunded to Grantor. All sums paid or agreed to be paid to the Beneficiary for the use, forbearance or detention of the indebtedness of the Grantor to the Beneficiary shall be amortized, prorated, allocated and spread throughout the full term of the Note until payment in full so that the actual rate of interest on account of such indebtedness is uniform throughout the term of the Note.

8.10. In the event of the passage after the date of this Deed of Trust of any applicable law changing in any way the laws for the taxation of deeds of trust and/or the debts secured thereby so as to affect Beneficiary's rights under this Deed of Trust in a materially adverse way, Beneficiary shall have the right, at Beneficiary's option (after the expiration of any applicable cure period), to declare the Indebtedness immediately due and payable.

8.11. The Loan Documents contain the entire agreement between the parties relating to the subject matter hereof and thereof, and all prior agreements relative thereto which are not contained herein or therein are terminated. The Loan Documents may be amended, revised, waived, discharged, released or terminated only by a written instrument or instruments, executed by the party against which enforcement of the amendment, revision, waiver, discharge, release or termination is asserted. Any alleged amendment, revision, waiver, discharge, release or termination which is not so documented shall not be effective as to any party.

8.12. This Deed of Trust may be executed in any number of counterparts, each of which shall be an original but all of which together shall constitute but one instrument.

8.13. If any or all of the proceeds of the Note have been used to extinguish, extend or renew any indebtedness heretofore existing against the Property, then, to the extent of such funds so used, the Indebtedness and this Deed of Trust shall be subrogated to all of the rights, claims, liens, titles and interests heretofore existing against the Property to secure the indebtedness so extinguished, extended or renewed and the former rights, claims, liens, titles and interests, if any, are not waived but rather are continued in full force and effect in favor of Beneficiary and are merged with the lien and security interest created herein as cumulative security for the repayment of the Indebtedness and the satisfaction of the Obligations.

8.14. This Deed of Trust shall be governed by and construed according to the laws of the State of Texas and the applicable laws of the United States of America. This Deed of Trust is performable in Burnet County, Texas.

8.15. Whenever the context hereof requires, references herein to the singular number shall include the plural, and likewise the plural shall include the singular; words denoting gender shall be construed to include the masculine, feminine and neuter, where appropriate; and specific enumeration shall not exclude the general, but shall be considered as cumulative.

8.16. If the Grantor consists of more than one party, the obligations of each party constituting the Grantor to pay the Indebtedness and perform the Obligations shall be joint and several; and if the Obligated Party consists of more than one party, the obligations of each party constituting the Obligated Party to pay the Indebtedness and perform the Obligations shall be joint and several.

8.17. If Grantor performs all the covenants and pays the Indebtedness in full, this Deed of Trust shall have no further effect, and Beneficiary shall release it at Grantor's expense.

**8.18. WAIVER OF DEFICIENCY STATUTE PROTECTIONS/FAIR MARKET VALUE FOR CALCULATING DEFICIENCIES. Notwithstanding the provisions of Sections 51.003, 51.004, and 51.005 of the Texas Property Code, Grantor agrees that Beneficiary shall be entitled to seek a deficiency judgment from Grantor and any other party obligated on the Note or any guarantor of the Note, equal to the difference between the amount owing on the Note and the amount for which the Property was sold pursuant to a judicial or nonjudicial foreclosure sale. Grantor expressly recognizes that this section constitutes a waiver of the above-cited provisions of the Texas Property Code which would otherwise permit Grantor and other persons against whom recovery of deficiencies is sought or guarantors independently (even absent the initiation of deficiency proceedings against them) to present competent evidence of the fair market value of the Property as of the date of foreclosure and offset the fair market value of the Property as of the date of foreclosure against any deficiency, the amount by which the foreclosure sale price is determined to be less than such fair market value. Grantor further recognizes and agrees that this waiver creates an irrebuttable presumption that the foreclosure sale price is equal to the fair market value of the Property for purposes of calculating deficiencies owed by Grantor, other borrowers on the Note, guarantors, and others against whom recovery of a deficiency is sought.**

8.19    The Note secured by this Deed of Trust was made under a United States Small Business Administration (SBA) nationwide program which uses tax dollars to assist small business owners. If the United States is seeking to enforce this Deed of Trust, then under SBA guidelines:

(a)    When the SBA is the holder of the Note, this Deed of Trust and all documents evidencing or securing the Note shall be construed in accordance with federal law.

(b)    Beneficiary or the SBA may use local or state procedures for purposes such as filing papers, recording documents, giving notice, foreclosing liens and other purposes. By using these procedures, the SBA does not waive any federal immunity from local or state control, penalty, tax or liability. Neither Grantor, nor any guarantor of the Grantor's obligations may claim or asset against the SBA any local or state law to deny any obligation of Grantor or defeat any claim of the SBA with respect to the Note and this Deed of Trust.

Any provision in this Deed of Trust requiring arbitration is not enforceable when the SBA is the holder of the Note secured by this Deed of Trust.

**EXECUTED** as of the date of the acknowledgment set forth below, but effective as of June ____, 2023.

**GRANTOR:**

**BUBBLES & BARKS HOLDINGS, LLC,**
a Texas limited liability company

By: _____
    Gary M. Eggleston Jr., Manager

By: _____
    Jamie P. Eggleston, Manager

**STATE OF TEXAS**        §
                        §
**COUNTY OF** _Bexar_    §

This Deed of Trust, Security Agreement and Assignment of Rents was acknowledged before me on June _8_, 2023, by Gary M. Eggleston Jr., as Manager of Bubbles & Barks Holdings, LLC, a Texas limited liability company, on behalf of the limited liability company.

> BRANDON CLEMENTSON
> Notary Public
> STATE OF TEXAS
> My Comm. Exp. 11/21/2023
> Notary ID 124754514

_____
Notary Public in and for the
State of Texas

**STATE OF WASHINGTON**   §
                              §
**COUNTY OF** _____  §

This Deed of Trust, Security Agreement and Assignment of Rents was acknowledged before me on June ____, 2023, by Jamie P. Eggleston, as Manager of Bubbles & Barks Holdings, LLC, a Texas limited liability company, on behalf of the limited liability company.

_____
Notary Public in and for the
State of Washington

**EXECUTED** as of the date of the acknowledgment set forth below, but effective as of June 8___, 2023.

**GRANTOR:**

**BUBBLES & BARKS HOLDINGS, LLC,**
a Texas limited liability company

By: _____
        Gary M. Eggleston Jr., Manager

By: _____
        Jamie P. Eggleston, Manager

**STATE OF TEXAS**                     §
                                       §
**COUNTY OF** _____          §

This Deed of Trust, Security Agreement and Assignment of Rents was acknowledged before me on June ___, 2023, by Gary M. Eggleston Jr., as Manager of Bubbles & Barks Holdings, LLC, a Texas limited liability company, on behalf of the limited liability company.

                                    _____
                                    Notary Public in and for the
                                    State of Texas

**STATE OF WASHINGTON**               §
                                      §
**COUNTY OF** Snohomish                §

This Deed of Trust, Security Agreement and Assignment of Rents was acknowledged before me on June 8___, 2023, by Jamie P. Eggleston, as Manager of Bubbles & Barks Holdings, LLC, a Texas limited liability company, on behalf of the limited liability company.

DAVID W KRAUSE
Notary Public
State of Washington
Commission # 112049
My Comm. Expires Sep 16, 2025

Notary Public in and for the   David W. Krause
State of Washington   Expires 09.16.2025

DEED OF TRUST, SECURITY AGREEMENT
AND ASSIGNMENT OF RENTS - Page 26

# EXHIBIT "A"

## Property Description

FIELD NOTES to accompany a survey plat for a 7.54 acre tract of land out of the Jefferson Barton Survey No. 104, Abstract No. 58, Burnet County, Texas, and being out of that certain tract of land described as 10 acres in a deed to Robert Lee Pacini and wife, Olivia Ann Pacini, recorded in Volume 641, Page 322 of the Real Property Records of Burnet County, Texas, and being the same tract of land described as 7.533 acres in a deed to Joe F. Adams and wife Carol S. Adams, recorded in Volume 707, Page 202 of the Real Property Records of Burnet County, Texas.

BEGINNING at a ½" iron rod found at the intersection of the north right-of-way line of F.M. Highway No. 1855, with the east line of Burnet County Road No. 121, for the southwest corner hereof and of said 10.00 acre tract.

THENCE N12°10'19"W (called N12°10'19"W), with the west line hereof and of said 10.00 acre tract, being the east line of said Burnet County Road No. 121, and partially with or near a wire fence, a distance of 591.16 feet (called 591.17 feet) to a ½" iron rod found at the base of a fence corner post at the southwest corner of that certain tract of land described as 10.00 acres in a deed to Collier Materials, Inc., recorded in Volume 1022, Page 805 of the Official Public Records of Burnet County, Texas, for the northwest corner hereof and of said 10.00 acre tract;

THENCE, with the north line hereof and of said 10.00 acre tract, being the south line of said 10.00 acre tract recorded in Volume 1022, Page 805, and with or near a wire fence, the following 2 calls:

1) N73°20'35"E (called N73°23'15"E), a distance of 313.82 feet (called 314.04 feet) to a ½" iron rod found at the base of a fence post for an angle point hereof;

2) N59°45'56"E (called N59°39'44"E), a distance of 244.09 feet (called 243.87 feet) to a ½" iron rod found at a fence corner post at the northwest corner of that certain tract of land described as 12.27 acres in a deed to the William H. Lancet and wife, Rita Lancet, recorded in Volume 1118, Page 581 of the Official Public Records of Burnet County, Texas, for the northeast corner hereof;

THENCE S12°00'06"E (called S12°00'57"E), with the east line hereof, being the west line of said 12.27 acre tract, and with or near a wire fence, a distance of 649.22 feet (called 649.33 feet) to a ½" iron rod found in the north right-of-way line of said F.M. highway No. 1855, being the south line of said 10.00 acre tract recorded in Volume 641, Page 222, and being the southwest corner of said 12.27 acre tract, for the southeast corner hereof, from which a ½" iron rod found at the southeast corner of said 10.00 acre tract recorded in Volume 641, Page 222 bears N73°25'22"E (called 73°23'15"E), a distance of 317.13 feet (called 317.14 feet);

THENCE S73°23'15"W (Basis of Bearings), with the south line hereof and of said 10.00 acre tract recorded in Volume 641, Page 222, being the north right-of-way line of said F.M Highway No. 1855, partially with or near a wire fence, a distance of 544.62 feet to the place of beginning and containing 7.54 acres.

EXHIBIT "A" - Page Solo

<u>**EXHIBIT "B"**</u>

**Permitted Encumbrances**

1.  Standby fees, taxes and assessments by any taxing authority for the 2023 tax year, and subsequent years not yet due and payable.

2.  Restrictions set out in Volume 641, Page 300 and Volume 641, Page 306, Real Property Records of Burnet County, Texas.

3.  Rescission of Restrictions recorded in Volume 1103, Page 321, Official Public Records of Burnet County, Texas. Regulations and ordinances of Burnet County. The State of Texas and all departments and political subdivisions thereof, including Burnet County Subdivision Regulations, dated April 25, 2000, recorded in Volume 943, Page 399, and amended in Volume 993, Page 620, Volume 1043, Page 85, Volume 1377, Page 722, Clerk's File No. 201100417, and corrected in Clerk's File No. 201100547 Official Public Records of Burnet County, Texas.

AFTER RECORDING RETURN TO:

Colven, Tran & Meredith, P.C.
1401 Burnham Drive
Plano, Texas 75093

EXHIBIT "B" - Page 1

**THE STATE OF TEXAS**
**COUNTY OF BURNET**

I hereby certify that this instrument was FILED on the date and the time stamped hereon by me and was duly RECORDED in the Records of Burnet County, Texas.

202305576 DT
06/09/2023 02:25:32 PM  Total Fees: $138.00

Vicinta Stafford,County Clerk
Burnet County, Texas

# EXHIBIT 3



U.S. Small Business Administration

# NOTE

| SBA Loan # | ████████ |
|---|---|
| SBA Loan Name | BUBBLES & BARKS, LLC |
| Date | JUNE 8 , 2023 |
| Loan Amount | $1,800,000.00 |
| Interest Rate | WALL STREET JOURNAL PRIME RATE + 0.50% PER ANNUM |
| Borrower | BUBBLES & BARKS HOLDINGS, LLC and BUBBLES & BARKS, LLC |
| Operating Company | BUBBLES & BARKS, LLC |
| Lender | LIVE OAK BANKING COMPANY |

1. PROMISE TO PAY:

In return for the Loan, Borrower promises to pay to the order of Lender the amount of

ONE MILLION EIGHT HUNDRED THOUSAND and NO/100         Dollars,

interest on the unpaid principal balance, and all other amounts required by this Note.

2. DEFINITIONS:

"Collateral" means any property taken as security for payment of this Note or any guarantee of this Note.

"Guarantor" means each person or entity that signs a guarantee of payment of this Note.

"Loan" means the loan evidenced by this Note.

"Loan Documents" means the documents related to this loan signed by Borrower, any Guarantor, or anyone who pledges collateral.

"SBA" means the Small Business Administration, an Agency of the United States of America.

Case 26-11088-CMA    Doc 25    Filed 04/30/26    Ent. 04/30/26 12:42:42    Pg. 56 of 83

3. PAYMENT TERMS:

Borrower must make all payments at the place Lender designates. The payment terms for this Note are:

This Note will mature in 25 years from date of Note.

The interest rate on this Note will fluctuate. The initial interest rate is 8.50% per year. This initial rate is the Prime Rate in effect on the first business day of the month in which SBA received the loan application, plus 0.50%. The initial interest rate must remain in effect until the first change period begins unless changed in accordance with SOP 50 10.

Borrower must pay one payment of interest only on the disbursed principal balance one month from the month this Note is dated; payment must be made on the fifth calendar day in the month it is due.

Borrower must pay principal and interest payments of $14,508.14 every month, beginning two months from the month this Note is dated; payments must be made on the fifth calendar day in the months they are due.

Lender will apply each installment payment first to pay interest accrued to the day Lender receives the payment, then to bring principal current, then to pay any late fees, and will apply any remaining balance to reduce principal.

Lender and Borrower may agree to pay an additional amount into an escrow account for payment of real estate taxes and required insurance related to commercial real estate securing the loan when applicable. Any such account must comply with SOP 50 10.

The interest rate will be adjusted every calendar quarter (the "change period") beginning July 1, 2023 (date of first rate adjustment).

The "Prime Rate" is the Prime Rate in effect on the first business day of the month (as published in the Wall Street Journal newspaper) in which SBA received the application, or the first day of the month in which any interest rate change occurs. Base Rates will be rounded to two decimal places with .004 being rounded down and .005 being rounded up.

The adjusted interest rate will be 0.50% above the Prime Rate. Lender will adjust the interest rate on the first calendar day of each change period. The change in interest rate is effective on that day whether or not Lender gives Borrower notice of the change.

The interest rate identified in the Note may not be changed during the life of the Loan unless changed in accordance with SOP 50 10.

The interest rate adjustment period may only be changed in accordance with SOP 50 10.

Lender must adjust the payment amount at least annually as needed to amortize principal over the remaining term of the note.

If SBA purchases the guaranteed portion of the unpaid principal balance, the interest rate becomes fixed at the rate in effect at the time of the earliest uncured payment default. If there is no uncured payment default, the rate becomes fixed at the rate in effect at the time of purchase.
Loan Prepayment:
Notwithstanding any provision in this Note to the contrary:
Borrower may prepay this Note. Borrower may prepay 20 percent or less of the unpaid principal balance at any time without notice.
If Borrower prepays more than 20 percent and the Loan has been sold on the secondary market, Borrower must:
a. Give Lender written notice;
b. Pay all accrued interest; and
c. If the prepayment is received less than 21 days from the date Lender receives the notice, pay an amount equal to 21 days' interest from the date lender receives the notice, less any interest accrued during the 21 days and paid under subparagraph b., above.

If Borrower does not prepay within 30 days from the date Lender receives the notice, Borrower must give Lender a new notice.

Subsidy Recoupment Fee. When in any one of the first three years following the date of first disbursement Borrower voluntarily prepays more than 25% of the outstanding principal balance of the loan, Borrower must pay to Lender on behalf of SBA a prepayment fee for that year as follows:
a. During the first year after the date of first disbursement, 5% of the total prepayment amount;
b. During the second year after the date of first disbursement, 3% of the total prepayment amount; and
c. During the third year after the date of first disbursement, 1% of the total prepayment amount.

All remaining principal and accrued interest is due and payable 25 years from date of Note.

Late Charge: If a payment on this Note is more than 15 days late, Lender may charge Borrower a late fee of up to 4.00% of the unpaid portion of the regularly scheduled payment.

Case 26-11088-CMA    Doc 25    Filed 04/30/26    Ent. 04/30/26 12:42:42    Pg. 57 of 83

PAYMENT TERMS CONTINUED:

> N/A

4. DEFAULT:

Borrower is in default under this Note if Borrower does not make a payment when due under this Note, or if Borrower or Operating Company:

A. Fails to do anything required by this Note and other Loan Documents;

B. Defaults on any other loan with Lender;

C. Does not preserve, or account to Lender's satisfaction for, any of the Collateral or its proceeds;

D. Does not disclose, or anyone acting on their behalf does not disclose, any material fact to Lender or SBA;

E. Makes, or anyone acting on their behalf makes, a materially false or misleading representation to Lender or SBA;

F. Defaults on any loan or agreement with another creditor, if Lender believes the default may materially affect Borrower's ability to pay this Note;

G. Fails to pay any taxes when due;

H. Becomes the subject of a proceeding under any bankruptcy or insolvency law;

I. Has a receiver or liquidator appointed for any part of their business or property;

J. Makes an assignment for the benefit of creditors;

K. Has any adverse change in financial condition or business operation that Lender believes may materially affect Borrower's ability to pay this Note;

L. Reorganizes, merges, consolidates, or otherwise changes ownership or business structure without Lender's prior written consent; or

M. Becomes the subject of a civil or criminal action that Lender believes may materially affect Borrower's ability to pay this Note.

5. LENDER'S RIGHTS IF THERE IS A DEFAULT:

Without notice or demand and without giving up any of its rights, Lender may:

A. Require immediate payment of all amounts owing under this Note;

B. Collect all amounts owing from any Borrower or Guarantor;

C. File suit and obtain judgment;

D. Take possession of any Collateral; or

E. Sell, lease, or otherwise dispose of, any Collateral at public or private sale, with or without advertisement.

Case 26-11088-CMA    Doc 25    Filed 04/30/26    Ent. 04/30/26 12:42:42    Pg. 58 of 83

6. LENDER'S GENERAL POWERS:

Without notice and without Borrower's consent, Lender may:

A. Bid on or buy the Collateral at its sale or the sale of another lienholder, at any price it chooses;

B. Incur expenses to collect amounts due under this Note, enforce the terms of this Note or any other Loan Document, and preserve or dispose of the Collateral. Among other things, the expenses may include payments for property taxes, prior liens, insurance, appraisals, environmental remediation costs, and reasonable attorney's fees and costs. If Lender incurs such expenses, it may demand immediate repayment from Borrower or add the expenses to the principal balance;

C. Release anyone obligated to pay this Note;

D. Compromise, release, renew, extend or substitute any of the Collateral; and

E. Take any action necessary to protect the Collateral or collect amounts owing on this Note.

7. WHEN FEDERAL LAW APPLIES:

When SBA is the holder, this Note will be interpreted and enforced under federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability. As to this Note, Borrower may not claim or assert against SBA any local or state law to deny any obligation, defeat any claim of SBA, or preempt federal law.

8. SUCCESSORS AND ASSIGNS:

Under this Note, Borrower and Operating Company include the successors of each, and Lender includes its successors and assigns.

9. GENERAL PROVISIONS:

A. All individuals and entities signing this Note are jointly and severally liable.

B. Borrower waives all suretyship defenses.

C. Borrower must sign all documents necessary at any time to comply with the Loan Documents and to enable Lender to acquire, perfect, or maintain Lender's liens on Collateral.

D. Lender may exercise any of its rights separately or together, as many times and in any order it chooses. Lender may delay or forgo enforcing any of its rights without giving up any of them.

E. Borrower may not use an oral statement of Lender or SBA to contradict or alter the written terms of this Note.

F. If any part of this Note is unenforceable, all other parts remain in effect.

G. To the extent allowed by law, Borrower waives all demands and notices in connection with this Note, including presentment, demand, protest, and notice of dishonor. Borrower also waives any defenses based upon any claim that Lender did not obtain any guarantee; did not obtain, perfect, or maintain a lien upon Collateral; impaired Collateral; or did not obtain the fair market value of Collateral at a sale.

10. STATE-SPECIFIC PROVISIONS:

Oral agreements or oral commitments to loan money, extend credit, or to forbear from enforcing repayment of a debt are not enforceable under Washington law.

11. BORROWER'S NAME(S) AND SIGNATURE(S):

By signing below, each individual or entity becomes obligated under this Note as Borrower.

BORROWER:

BUBBLES & BARKS HOLDINGS, LLC,
a Texas limited liability company

By: _____
Gary M. Eggleston Jr., Manager

By: _____
Jamie P. Eggleston, Manager

BUBBLES & BARKS, LLC,
a Washington limited liability company

By: _____
Gary M. Eggleston Jr., Member

By: _____
Jamie P. Eggleston, Member

Case 26-11088-CMA   Doc 25   Filed 04/30/26   Ent. 04/30/26 12:42:42   Pg. 61 of 83

11. BORROWER'S NAME(S) AND SIGNATURE(S):

By signing below, each individual or entity becomes obligated under this Note as Borrower.

BORROWER:

BUBBLES & BARKS HOLDINGS, LLC,
a Texas limited liability company

By: _____
Gary M. Eggleston Jr., Manager

By: *Jamie P. Eggleston*
Jamie P. Eggleston, Manager

BUBBLES & BARKS, LLC,
a Washington limited liability company

By: _____
Gary M. Eggleston Jr., Member

By: *Jamie P. Eggleston*
Jamie P. Eggleston, Member

Case 26-11088-CMA    Doc 25    Filed 04/30/26    Ent. 04/30/26 12:42:42    Pg. 62 of 83

# EXHIBIT 4

# LOAN AGREEMENT

THIS LOAN AGREEMENT (the "Agreement") dated to be effective as of June 0Ꮹ, 2023, is made by and between **LIVE OAK BANKING COMPANY** (the "Lender"), whose address is 1741 Tiburon Drive, Wilmington, North Carolina 28403, and **BUBBLES & BARKS HOLDINGS, LLC,** a Texas limited liability company, **and BUBBLES & BARKS, LLC**, a Washington limited liability company (collectively, the "Borrower"), **and GARY M. EGGLESTON JR., JAMIE P. EGGLESTON and BRIANNA D. EGGLESTON** (collectively, the "Guarantors"), whose addresses are 1728 FM 1855, Marble Falls, Texas 78654.

## ARTICLE 1.
## DEFINITIONS

For purposes of this Agreement, the following terms shall have the respective meanings assigned to them.

1.1 **Closing Date**. The term "Closing Date" shall mean the date of execution of this Agreement and all other Security Instruments which shall occur as of, although not necessarily on, the date first written above.

1.2 **Code**. The term "Code" shall mean the Texas Business and Commerce Code as now written or as hereafter amended or succeeded.

1.3 **Credit Alert Interactive Verification Reporting System**. The term "CAIVRS" shall mean the Credit Alert Interactive Verification Reporting System, as now written or as hereafter amended or succeeded. CAIVRS is used to determine if a loan applicant has a federal debt that is currently in default or foreclosure or has had a claim paid by the reporting agency within the last three years.

1.4 **Deed of Trust**. The term "Deed of Trust" shall mean that certain Deed of Trust, Security Agreement and Assignment of Rents to be executed by Bubbles & Barks Holdings, LLC, a Texas limited liability company, granting to Lender a first lien and prior security interest in the Property to secure the payment and performance of all obligations specified in this Agreement and the Security Instruments.

1.5 **Financial Statements**. The term "Financial Statements" shall mean the balance sheets, profit and loss statements, and other financial information of Borrower heretofore furnished to Lender or required to be furnished to Lender under the terms of this Agreement or any of the Security Instruments from time to time, which statements shall be prepared in such scope, detail and form as shall be acceptable to Lender and, if required by Lender, certified by an independent certified public accountant selected by Borrower which is satisfactory to Lender.

LOAN AGREEMENT - Page 1
 vpd

1.6 **Financing Statements**. The term "Financing Statements" shall mean the financing statements perfecting the security interests securing the Loan, to be filed with the appropriate offices for the perfection of a security interest in the Property and Improvements.

1.7 **Governmental Authority**. The term "Governmental Authority" shall mean the United States, the state, the county, the city, and any other political subdivision in which the Property is located, and any other political subdivision, agency, or instrumentality exercising jurisdiction over Borrower or the Property.

1.8 **Governmental Requirements**. The term "Governmental Requirements" shall mean all laws, ordinances, rules and regulations of any Governmental Authority applicable to Borrower or the Property.

1.9 **Guaranty Agreements**. The term "Guaranty Agreements" shall mean the written agreements providing for the guarantee by the Guarantors of payment of the Loan and all of Borrower's obligations under the Security Instruments.

1.10 **Loan**. The term "Loan" shall mean the loan by Lender to Borrower pursuant to this Agreement and to be evidenced by the Note.

1.11 **Note**. The term "Note" shall mean the promissory note from Borrower to Lender to be executed upon the execution of this Agreement in the principal amount of $1,800,000.00.

1.12 **Property**. The term "Property" shall mean the real property described in Exhibit "A" attached hereto and incorporated herein by reference, together with the improvements now existing or constructed thereon.

1.13 **SBA Agreement**. The term "SBA Agreement" shall mean the Authorization Agreement dated May 31, 2023, by and between the Lender and the United States Small Business Administration ("SBA") governing the obligations arising out of the Note and Deed of Trust.

1.14 **SBA Guaranty Fee**. The term "SBA Guaranty Fee" shall mean $48,125.00 payable to the SBA on the date hereof, if not previously paid, in consideration of Lender's originating the loan to the Borrower evidenced by the Note and partially guaranteed by the SBA.

1.15 **Security Agreement** The term "Security Agreement" shall mean that certain Security Agreement dated June _6_, 2023, between the Borrower, as debtor, and the Lender, as secured party, granting to Lender liens and security interests in certain personal property more particularly described therein.

1.16    **Security Instruments.** The term "Security Instruments" shall mean this Agreement, the Guaranty Agreements, the SBA Agreement, the Deed of Trust, the Note, the Security Agreement, the Financing Statements, and such other instruments evidencing, securing, or pertaining to the Loan as shall, from time to time, be executed and delivered by Borrower or any other party to Lender pursuant to this Agreement.

1.17    **Title Company.** The term "Title Company" shall mean First American Title Guaranty Company, 7373 Broadway Suite 105, San Antonio, Texas 78209.

## ARTICLE 2.
## THE LOAN; CONDITIONS PRECEDENT TO LOAN

2.1    **The Loan.** Subject to the terms and conditions of this Agreement and SBA Agreement, Lender agrees to make a loan to the Borrower for the purpose of purchasing the Property and the assets of an existing business located thereon. The obligation of the Borrower to repay the Loan shall be evidenced by the Note executed by the Borrower and payable to the Lender. The payment terms of the Note shall be as provided therein. To secure full and complete payment and performance of the Loan, Borrower shall execute and deliver to the Lender, among other things, the Deed of Trust. The obligations of the Borrower under the Loan are personally guaranteed by the Guarantors pursuant to the terms of the Guaranty Agreements.

2.2    **Conditions Precedent.** The following must be satisfied as conditions precedent to Lender's obligation to make the Loan as of the Closing Date:

(a)    All representations and warranties set forth in this Agreement and in the Security Instruments shall be true and complete as of the Closing Date.

(b)    No Event of Default, as defined herein or in the Security Instruments, and no event or condition which with notice or the passage of time or both as prescribed herein or in the Security Instruments, would constitute any such Event of Default has occurred and remains uncured to Lender's satisfaction.

(c)    There shall have been no material adverse change in the condition of the Property or in the business or financial condition of Borrower or any of the Guarantors.

(d)    The Property shall not have suffered any significant damage by fire or other casualty and no condemnation or adverse zoning proceedings shall have been commenced or threatened, and no law, regulation, ordinance, moratorium, injunctive proceeding, restriction or similar matter shall have been enacted, adopted or threatened by any Governmental Authority if the result of such law, regulation, ordinance, moratorium, injunctive proceeding, restriction or like matter would have the effect in Lender's reasonable judgment, of materially and adversely effecting the expected benefits to be gained by

pd

Borrower in connection with the Property or by Lender in connection with its assisting Borrower in financing the subject transaction for any reason.

(e)     All statements and other information contained in the Borrower's Financial Statements are true and complete, in all material respects, and all other certificates, statements and data furnished to Lender by or on behalf of Borrower or any of the Guarantors in connection with the transactions contemplated by this Agreement or any of the other Security Instruments are true and complete in all material respects, and there are no facts or events known to Borrower or any of the Guarantors which, if disclosed to Lender, would make such statements, certificates or data untrue in any material respect.

(f)     Borrower and Guarantors, as the case may be, shall have executed and acknowledged the Security Instruments in form reasonably acceptable to the Lender. The Borrower shall pay or cause to be paid the SBA Guaranty Fee due the Lender.

(g)     Borrower shall have caused to be delivered to the Lender a title insurance policy in form and content satisfactory to the Lender, showing the Property to be free and clear of all defects or encumbrances except such as Lender shall approve, issued by the Title Company, committing to insure the Property for the maximum principal amount of the indebtedness owing or to be owing to Lender on account of the Note, with no exceptions or exclusions other than as may be approved by the Lender.

(h)     Borrower shall have delivered to the Lender the insurance policies or certificates of such insurance as specified in Section 4.7 herein.

(i)     Borrower shall have provided Lender with evidence that Borrower has obtained all building permits and other permits, licenses or approvals required by the Governmental Requirements with respect to the ownership, development and operation of the Property.

(j)     Borrower shall have provided Lender with evidence satisfactory to Lender or its legal counsel that all necessary action on the part of the Borrower has been taken with respect to the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, so that this Agreement and all Security Instruments executed and delivered by or on behalf of the Borrower, shall be valid and binding upon the Borrower, or the person executing and delivering such document, in accordance with its terms.

(k)     Borrower shall have delivered to Lender such other documents as Lender shall reasonably require.

▊▊▊▊▊▊▊▊▊▊▊ pd

2.3 **Additional Security**. If at any time Lender shall determine in good faith that the Property has declined or may decline in value or Lender shall deem payment of the Note to be insecure, then Lender may call for additional collateral to secure the Loan satisfactory to Lender.

2.4 **Use of Proceeds**. Borrower shall use the proceeds only as set forth in Section G of the SBA Agreement.

2.5 **USA Patriot Act Verification Information**. Borrower shall provide evidence of its legal name, tax identification number, and street address, and a driver's license and date of birth (if the Borrower is an individual), satisfactory to and sufficient for the Lender to verify the identity of the Borrower, as required under the USA Patriot Act. Borrower shall notify Lender promptly of any change in such information.

2.6 **Conditions Precedent for the Benefit of Lender**. All conditions precedent to the obligation of Lender to make the Loan are imposed hereby solely for the benefit of Lender, and no other party may require satisfaction of any such condition precedent or be entitled to assume that Lender will refuse to make the Loan in the absence of strict compliance with such conditions precedent.


## ARTICLE 3.
## REPRESENTATIONS AND WARRANTIES OF BORROWER

Borrower represents and warrants to Lender as follows:

3.1 **The Financial Statements**. The Financial Statements are true, correct, and complete, in all material respects, as of the dates specified therein and fully and accurately present the financial condition of Borrower and Guarantors. No material adverse change has occurred in the financial condition of Borrower or any of the Guarantors since the date of the Financial Statements.

3.2 **Suits, Actions, Etc**. There are no material actions, suits, or proceedings pending or threatened in any court, before or by any Governmental Authority against or affecting Borrower, any of the Guarantors or the Property, or involving the validity, enforceability, or propriety of any of the Security Instruments, at law or in equity. The consummation of the transactions contemplated hereby, and the performance of any of the terms and conditions hereof and of the Security Instruments, shall not result in a breach of, or constitute a default in, any deed of trust, mortgage, lease, promissory note, loan agreement, credit agreement, partnership agreement, or other agreement to which Borrower or any of the Guarantors is a party or by which Borrower or any of the Guarantors may be bound or affected.

LOAN AGREEMENT - Page 5

'pd

3.3     **Valid and Binding Obligation.** All of the Security Instruments, and all other documents referred to herein to which Borrower or any of the Guarantors is a party, constitute valid and binding obligations of Borrower and Guarantors, enforceable in accordance with their terms except as limited by debtor relief laws.

3.4     **Title to Property.** Borrower holds full legal and equitable title to the Property subject only to title exceptions set forth in the title insurance policy accepted by Lender.

3.5     **Compliance With Governmental Requirements.** Borrower and Guarantors are (a) in compliance with all material requirements of all applicable federal, state and local environmental, health and safety statutes and regulations and shall continue to be in compliance therewith during the term of the Loan, and (b) not the subject of any federal, state or local investigation evaluating whether any remedial action is necessary to respond to a release of any toxic or hazardous waste or substance to the environment.

3.6     **Toxic and Hazardous Substances.** To the actual knowledge of Borrower: (a) no part of the Property is contaminated in any respect by any Hazardous Materials (as hereinafter defined), (b) Borrower has not caused or suffered to occur any material discharge, spillage, uncontrolled loss, seepage or filtration of oil or petroleum, chemical liquids or solids, liquid or gaseous products, or hazardous wastes or hazardous substances at, upon, under or within the Property, and (c) no owner of any property located adjacent to or near the Property is currently involved in operations which could reasonably be expected to lead to the imposition on Borrower of liability or creation of a lien or security interest on Borrower's assets, including, without limitation, the Property, under any Governmental Requirements. For the purposes of this Section 3.6, the term "Hazardous Materials" shall mean any substance the presence of which on the Property is regulated by any Governmental Requirements, including but not limited to: (i) any "Hazardous Waste" as defined by the Resource Conservation and Recovery Act of 1976 (42 USC, Sec. 6901, et. seq.), as amended from time to time, and the regulations promulgated thereunder; (ii) any "Hazardous Substance" as defined by the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 USC, Sec. 9601, et. seq.), as amended from time to time, and the regulations promulgated thereunder; (iii) asbestos; (iv) polychlorinated biphenyls; (v) any petroleum based products; and, (vi) underground storage tanks, whether empty, filled or partially filled with any substance.

3.7     **Incorporation of Representations and Warranties.** Each representation, warranty and covenant of Borrower and Guarantors contained in the Security Instruments are hereby incorporated herein by reference for all purposes.

3.8     **Existence.** Borrower is two (2) limited liability companies, duly organized and validly existing in good standing under the laws of the State of Texas and the State of Washington and has all requisite power and authority to own the Property. All approvals or consents of any person or entity required in connection with the execution and delivery of and performance by Borrower of its obligations under this Agreement and the Security Instruments has been obtained.

**LOAN AGREEMENT** - Page 6

3.9　**Management and Ownership**. No material change shall be made without the prior written consent of Lender in the management or ownership of Borrower, or in the manner in which its business is conducted. Said consent shall not be unreasonably withheld by Lender. No change to the Borrower's organizational structure shall be made without Lender's prior written consent, which consent shall only be granted in Lender's sole and absolute discretion.


## ARTICLE 4.
## COVENANTS AND AGREEMENTS OF BORROWER

Borrower covenants and agrees as follows:

4.1　**Compliance with Governmental Requirements**. Borrower shall timely comply with all Governmental Requirements, including but not limited to, zoning requirements and building restrictions.

4.2　**Inspection of the Property; Appraisal**. Borrower shall permit Lender, any Governmental Authority, and their agents and representatives, to enter upon the Property for the purpose of inspection of the Property at all reasonable times. In addition, at Lender's option, but in no event more than once every three (3) years, Lender may secure an appraisal of the Property. The cost of such appraisal shall be borne by the Borrower. In connection therewith, Borrower shall permit Lender and its appraiser to enter upon the Property for the purpose of conducting such appraisal at all reasonable times.

4.3　**Notices by Governmental Authority, Fire and Casualty Losses, Etc**. Borrower shall timely comply with and furnish to Lender, within three (3) days of receipt thereof, true and complete copies of any official notice or claim by any Governmental Authority pertaining to the Property. Borrower shall immediately notify Lender of any fire or other casualty or any notice of taking or eminent domain action or proceeding affecting the Property.

4.4　**Costs and Expenses**. Borrower shall pay when due all costs and expenses required by this Agreement, including, without limitation, (a) all taxes and assessments applicable to the Property, (b) all fees for filing or recording the Security Instruments, (c) all fees and expenses of counsel to Lender related to the closing of the Loan, (d) all title insurance and title examination charges, (e) all survey costs and expenses, (f) all premiums for insurance policies, and (g) all other costs and expenses payable to third parties incurred by either Borrower or Lender in connection with the consummation of the transactions contemplated by this Agreement.

4.5　**Additional Documents**. Borrower and Guarantors shall execute and deliver to Lender, from time to time as requested by Lender, such other documents as shall be necessary to provide the rights and remedies to Lender granted or provided for by the Security Instruments. Each calender year, Borrower shall provide to Lender, its list of leases and the amount of rent due under such leases.

██████████████ /pd

4.6    **Inspection of Books and Records**. Borrower and Guarantors shall permit Lender, at all reasonable times, to examine and copy the books and records of Borrower. Such books and records of Borrower shall be kept in accordance with generally accepted accounting principles.

4.7    **Insurance**. Borrower shall maintain or cause to be maintained in full force until full payment of the Loan such insurance on the Property as is satisfactory in all respects to Lender. Casualty insurance policies shall name Lender as loss payee and Borrower shall deliver the original or certified copies of these policies to Lender. Liability insurance shall be evidenced by a certificate of insurance issued to Lender, naming Lender as additional insured. All insurance required herein shall be issued by responsible carriers acceptable to Lender and provide at least thirty (30) days prior written notice to Lender of cancellation, non-renewal or material change.

4.8    **Prohibition of Transfers**. Except as otherwise provided herein or the Security Instruments, Borrower shall not, without the prior written consent of Lender, transfer, convey, assign, lease, encumber or otherwise dispose of the Property.

4.9    **Payment of Claims**. Borrower shall promptly pay or cause to be paid when due all costs and expenses incurred in connection with the Property, and Borrower shall keep the Property free and clear of any liens, charges, or claims other than liens approved in writing by Lender. Notwithstanding anything to the contrary contained in this Agreement or the Security Instruments, Borrower (a) may contest the validity or amount of any claim of any contractor, consultant, architect, or other person providing labor, materials, or services with respect to the Property, (b) may contest any tax or special assessments levied by any Governmental Authority, and (c) may contest the enforcement of or compliance with any Governmental Requirements, and such contest on the part of Borrower shall not be a default hereunder; provided, however, that during the pendency of any such contest, Borrower shall furnish to Lender an indemnity bond with a corporate surety satisfactory to Lender or other security acceptable to them in an amount equal to one hundred fifty percent (150%) of the amount being contested to cover possible costs, interest, and penalties, and provided further that Borrower shall pay any amount adjudged by a court of competent jurisdiction to be due, with all costs, interest, and penalties thereon, before such judgment becomes a lien on the Property.

4.10    **Financial Statements**. Within sixty (60) days after the end of each fiscal quarter, Borrower shall furnish or cause to be furnished to Lender a copy of the Borrower's current internal, unaudited quarterly Financial Statements, and those of the Guarantors, (provided, however that with respect to the Guarantors, only annual Financial Statements need to be provided). Within sixty (60) days after the expiration of each calendar year, Borrower and Guarantors shall furnish to Lender annual Financial Statements of Borrower. Borrower's Financial Statements shall contain a balance sheet, profit and loss statement and aging of accounts receivable and account payable, all in reasonable detail, prepared in accordance with generally accepted accounting principles, consistently applied. Each set of Financial Statements shall be certified by a duly authorized officer of Borrower and Guarantors to be correct and accurate. Borrower and Guarantors shall also furnish copies of their complete income tax returns within thirty (30) days of filing, commencing with the tax return filed or to be filed for the current calendar year. Other information, such as proof of real property

tax payments, accounts payable agings, more frequent interim Financial Statements and additional financial information may be required at the Lender's request.

4.11    **Notification of Adverse Changes.** Borrower and Guarantors shall promptly notify Lender of the occurrence of any event or condition which, if not remedied, would result in a material, adverse change to the financial condition of Borrower and Guarantors, or would materially and adversely affect the value of the Property or any portion thereof, or is a material adverse change as set forth in Section 2.2(c) above.

4.12    **Indemnification.** Borrower and Guarantors each agree to indemnify, defend and hold Lender harmless from and against any and all claims, charges, actions, suits, liabilities, fines, penalties, costs and expenses, including, but not limited to, reasonable attorneys' fees, incurred by Lender in connection with the collection of the Loan or the enforcement of the Security Instruments or the attempt to foreclose and otherwise realize on collateral after the occurrence of an Event of Default. The obligations and provisions of this Section 4.12 shall continue and remain in full force and effect after the Loan and other obligations of Borrower under this Agreement and the Security Instruments have been paid or discharged in full and shall survive the termination of this Agreement and the repayment of the Loan.

# ARTICLE 5.
# CERTAIN COVENANTS

Until payment and performance in full of the Loan, unless Borrower receives prior written approval of a deviation from Lender, Borrower covenants and agrees with Lender that:

5.1    **Obligations.** Borrower shall promptly and fully perform all of their obligations under this Agreement and the Security Instruments and refrain from doing any act or acts that would violate any covenant under this Agreement or the Security Instruments. Borrower will do everything necessary for Lender to comply with the terms and conditions of the SBA Agreement.

5.2    **Litigation.** Borrower and Guarantors shall promptly notify Lender of (a) the existence and status of any litigation which could, in the event of an unfavorable outcome, have a material adverse effect on Borrower, any of the Guarantors or the Property and (b) any material adverse change in any fact or circumstance represented or warranted.

5.3    **Taxes.** Borrower and Guarantors shall promptly pay all of their respective taxes and indebtedness as the same become due or obtain all necessary and lawful extensions thereof. Borrower shall deliver to the Lender proof of payment of all ad valorem and personal property taxes assessed against the Property no later than January 31 of each year during the term of the Loan.

▮▮▮▮▮▮▮▮▮▮▮▮ nd

5.4 **Maintenance of Business and Good Standing**. Borrower shall comply with all valid and applicable statutes, ordinances, rules and regulations under the laws of the State of Texas and the State of Washington and shall keep in force and effect all licenses, permits, bonds and franchises necessary for the proper conduct of its business. Borrower shall (a) maintain its corporate existence and good standing under the laws of the State of Texas and the State of Washington, and (b) comply in all material respects with Governmental Requirements.

5.5 **Leasing**. Borrower will not lease space to any business engaged in any activity that is illegal under federal, state or local law (such as marijuana dispensary).

5.6 **Life Insurance**. Borrower shall maintain or cause to be maintained in full force until full payment of the Loan such insurance on Brianna D. Eggleston as is satisfactory in all respects to Lender. All insurance required herein shall be issued by responsible carriers acceptable to Lender and provide at least thirty (30) days prior written notice to Lender of cancellation, non-renewal or material change.

## ARTICLE 6.
## EVENTS OF DEFAULT

6.1 **Default**. Any one or more of the following events shall constitute an "Event of Default" hereunder and under the Security Instruments:

(a) A failure to pay when and as the same shall become due and payable (after the expiration of any applicable cure period), whether by maturity or otherwise, any interest, principal or other amounts required to be paid under the Loan or under any of the Security Instruments.

(b) Default in the due observance or performance of any of the terms, covenants or conditions contained in this Agreement or the Security Instruments for more than thirty (30) days after receipt from the Lender of written notice of such default; provided, however, that such grace period set forth in this subsection (b) shall not apply to any other Event of Default expressly set forth in this Section 6.1 or to any Event of Default defined as such in the Note or any of the other Security Instruments relating to the Loan, or to any other covenant or condition with respect to which a grace period is expressly provided elsewhere.

(c) Any representation or warranty made by Borrower or any of the Guarantors to Lender in this Agreement or in the Security Instruments shall be incorrect in any material respect at the time when made or at the time when reaffirmed or deemed reaffirmed by the terms of this Agreement.

██████████████ ᵈ

(d) Subject to Borrower's rights to contest as contained herein, a failure by Borrower to pay or cause to be paid, before any fine, penalty, interest or cost may be added thereto, all franchise taxes and charges, ad valorem and personal property taxes, and other governmental charges of any kind and nature whatsoever, including but not limited to, assessments for public improvements or benefits which are assessed, levied, confirmed, imposed or become a lien upon the Property.

(e) Except as otherwise provided by the terms of this Agreement, any of the Security Instruments or leasing activity in the ordinary course of Borrower's business, Borrower sells, leases, exchanges, assigns, conveys or otherwise disposes of the Property or any interest therein, or enters into a written contract or agreement to do so, or grants or permits to exist any other deed of trust, mortgage or other lien, charge or encumbrance against the Property, whether superior or inferior to the Deed of Trust, or if individuals or an entity owning an equity interest in Borrower of ten percent (10%) or more, dispose of all or any part of such interest, without the prior written consent of Lender, such consent not to be unreasonably withheld.

(f) If a receiver, liquidator or trustee of Borrower, any of the Guarantors or of the Property or of any portion of their properties, shall be appointed.

(g) If a petition in bankruptcy or for reorganization or for protection under any debtor relief laws shall have been filed against Borrower or any of the Guarantors and the same is not withdrawn, dismissed, canceled or terminated within forty-five (45) days.

(h) If Borrower or any of the Guarantors makes an assignment for the benefit of creditors or files or consents to the filing of a petition in bankruptcy or for protection under any debtor relief laws or commences or consents to the commencement of any proceeding under the United States Bankruptcy Code or any other federal or state law, now or hereafter in effect, relating to the reorganization of Borrower or any of the Guarantors, or the arrangement or rearrangement or readjustment of the debts of Borrower or any of the Guarantors, or having the effect of enjoining or staying the exercise of rights or remedies by creditors.

(i) If there is an attachment or sequestration of or relating to any substantial portion of any assets of Borrower or any of the Guarantors, and the same is not promptly discharged.

(j) If Borrower or any of its members shall cause, institute or fail to contest any proceeding for the dissolution or termination of Borrower.

(k) If default shall occur under, or if there is any attempt to withdraw, cancel, or disclaim liability under the Guaranty Agreements or any other agreement which guarantees payment of the Loan or any other amount owed by Borrower to Lender.

LOAN AGREEMENT - Page 11

/pd

(l)    If Borrower ceases to do business or terminates its business as presently conducted for any reason whatsoever.

(m)    If Borrower or any of the Guarantors defaults under any other agreement that it has with Lender and such default continues beyond any applicable grace period.

(n)    If any default shall occur under any Security Instrument.

(o)    If a material adverse change occurs with respect to the financial condition of Borrower or any of the Guarantors, or with respect to the Property which would materially and adversely affect the value thereof.

(p)    As it relates to the collateral described herein, other than the Loan, the Borrower shall not directly or indirectly incur, create, assume or permit to exist any obligation for payment of borrowed money, excepting only unsecured current liabilities incurred in the ordinary course of business and obligations contemplated by this Agreement, without the express written consent of Lender, which consent shall not be unreasonably withheld. Further, Borrower shall not guarantee the obligations of any person or entity, excepting only obligations contemplated by this Agreement.

## ARTICLE 7.
## RIGHTS AND REMEDIES OF LENDER

7.1    **Rights of Lender**. Upon the occurrence of any one or more Event of Default, Lender shall have the right, in addition to any other right or remedy of Lender at equity or under applicable law, to commence collection and/or foreclosure proceedings under the terms and conditions of the Security Instruments.

7.2    **Acceleration**. Upon the occurrence of an Event of Default, Lender may, at its option, declare the outstanding balance of the Note immediately due and payable without notice of any kind, Borrower hereby waiving expressly, but not by way of limitation, notice of default, notice of intent to accelerate and notice of acceleration.

7.3    **No Waiver or Exhaustion**. No waiver by Lender of any of its rights or remedies hereunder, in the other Security Instruments, or otherwise, shall be considered a waiver of any other or subsequent right or remedy of Lender; no delay or omission in the exercise or enforcement by Lender of any rights or remedies shall ever be construed as a waiver of any right or remedy of Lender; and no exercise or enforcement of any such rights or remedies shall ever be held to exhaust any other right or remedy of Lender.

**LOAN AGREEMENT** - Page 12
█████████████████████ ud

7.4	**Other Remedies.** Upon the occurrence or discovery of an Event of Default, the Lender shall, in addition to its option to declare the entire unpaid amount of the Note due and payable, at its option:

(a)	Move to protect its rights and remedies as a secured party under the Deed of Trust, by extrajudicial authority as set forth in that instrument, by action at law or equity, or by any other lawful remedy to enforce payment.

(b)	Apply the proceeds from any disposition of the collateral to the satisfaction of the following items in the order in which they are listed:

(1)	The expenses of taking, preserving, insuring, repairing, holding and selling the collateral, including any legal costs and attorney's fees. If any of the Note shall be referred to an attorney for collection, Borrower and all others liable on the Note, jointly and severally agree to pay reasonable attorney's fees and all costs of collection.

(2)	The expenses of liquidating or satisfying any liens, security interest or encumbrances on or in the collateral which may be prior to the lien or security interest of Lender therein.

(3)	The unpaid amount of any interest due on the Note.

(4)	The unpaid principal amounts of the Note.

(5)	Any other indebtedness of Borrower to Lender.

(6)	The remainder, if any, to Borrower, it being understood and agreed that if the proceeds realized from the disposition of the Collateral shall fail to satisfy items (1) through (5) above, Borrower shall forthwith pay any such deficiency to Lender upon demand.

(c)	Exercise any and all rights of setoff which Lender may have against any account, fund or property of any kind, tangible or intangible, belonging to Borrower and which shall be in Lender's possession or under Lender's control.

(d)	Upon the occurrence of an Event of Default and SBA suffers a loss as determined solely by the SBA, the names of the Borrower and Guarantors shall be added to the CAIVRS database, which may affect their eligibility for further federal financial assistance.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▸d

# ARTICLE 8.
# GENERAL TERMS AND CONDITIONS

8.1    **Modifications**. No provision of this Agreement or the Security Instruments may be modified, waived, or terminated except by instrument in writing executed by the party against whom a modification, waiver or termination is sought to be enforced.

8.2    **Severability**. In case any of the provisions of this Agreement shall for any reason be held to be invalid, illegal, or unenforceable, such invalidity, illegality, or unenforceability shall not affect any other provision hereof, and this Agreement shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein; provided, however, if the disregard of such provision would frustrate the intent and purposes of this Agreement, Lender may petition any court having jurisdiction in equity to render a judgment modifying the disregarded provision of this Agreement so as to carry out such intent and purposes.

8.3    **Election of Remedies**. Lender shall have all of the rights and remedies granted in the Security Instruments in addition to such rights and remedies that may be available to Lender at law or in equity, and these same rights and remedies shall be cumulative and may be pursued separately, successively, or concurrently against Borrower, any of the Guarantors, or any property covered under the Security Instruments at the sole discretion of Lender. The exercise or failure to exercise any of the same shall not constitute a waiver or release thereof or of any other right or remedy, and such exercise or failure to exercise shall be nonexclusive.

8.4    **Form and Substance**. All documents, certificates, insurance policies, and other items required under this Agreement to be executed and/or delivered to Lender shall be in form and substance satisfactory to Lender and its legal counsel in their sole discretion.

8.5    **Number and Gender**. Whenever used herein, the singular number shall include the plural and the singular, and the use of any gender shall be applicable to all genders.

8.6    **Conflicts**. Except as expressly provided in any of the Security Instruments, in the event of any conflict between the provisions of this Agreement and those of any Security Instruments, the provisions of this Agreement shall govern.

8.7    **Time of Essence**. Time is of the essence in performance of this Agreement by Borrower.

8.8    **Further Assurances**. Borrower shall do, execute, acknowledge and deliver, at the sole cost and expense of Borrower, all and every such further acts, deeds, conveyances, mortgages, assignments, estoppel certificates, notices of assignment, transfers and assurances as Lender may reasonably require from time to time in order to better assure, convey, assign, transfer and confirm unto the Lender, the rights now or hereafter intended to be granted to the Lender under the Security

Instruments for carrying out the intention or facilitating the performance of the terms of this Agreement.

8.9 **Consent to Loan Participation**. Borrower consents to the Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to the Lender. Lender may provide to any one or more purchasers or potential purchasers, any information or knowledge Lender may have about the Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy it may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the purchasers of any participation interests shall be considered as the absolute owners of such interests in the Loan and shall have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against any purchaser of such participation interests and unconditionally agrees that such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interests in the Loan. Borrower further agrees that the purchaser of any such participation interest may enforce its interest irrespective of any personal claims or defenses that Borrower may have against Lender.

8.10 **Captions**. The captions, headings, and arrangements used in this Agreement are for convenience only and do not in any way affect, limit, amplify, or modify the terms and provisions hereof.

8.11 **GOVERNING LAW AND PARTIES ABOUND.** This Agreement shall be governed by and construed according to the laws of the State of North Carolina, except and only to the extent of procedural matters related to the perfection and enforcement of Lender's rights and remedies against the Collateral, which matters shall be governed by the laws of the State of Texas. However, in the event that the enforceability or validity of any provision of this Agreement is challenged or questioned, such provision shall be governed by whichever applicable state or federal law would uphold or would enforce such challenged or questioned provision. The loan transaction which is evidenced by the Note and this Agreement has been applied for, considered, approved and made, and all necessary loan documents have been accepted by Lender in the State of North Carolina.

8.12 **WAIVER OF JURY TRIAL. MAKER AND LENDER EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONJUNCTION WITH THE NOTE AND ANY OTHER LOAN DOCUMENTS EXECUTED IN CONNECTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF EITHER PARTY.**

‌pd

8.13 **Notices.** All notices by Lender to Borrower pursuant to any provisions of this Agreement or the Security Instruments, must be in writing. Such notices shall be given by personal delivery, expedited delivery service with proof of delivery, telegram, telex or telecopy, or mail (registered or certified, return receipt requested). Any such notice or communication shall be deemed to have been given and received either at the time of personal delivery; in the case of expedited delivery service or mail, as of the date of deposit in an official depository of the United States Postal Service or, as of the date of deposit with the expedited delivery service; or in the case of telegram, telex or telecopy, upon receipt (provided that such telegram, telex or telecopy is confirmed by expedited delivery or mail in the manner previously described). By giving at least ten (10) days written notice thereof, Borrower or Lender shall have the right from time to time and at any time during the term of this Agreement to change their respective addresses and each shall have the right to specify as its address any other address within the United States of America.

If to Lender:

Live Oak Banking Company
1741 Tiburon Drive
Wilmington, North Carolina 28403

If to Borrower or Guarantors:

Bubbles & Barks Holdings, LLC,
Bubbles & Barks, LLC,
Gary M. Eggleston Jr.,
Jamie P. Eggleston and
Brianna D. Eggleston
1728 FM 1855
Marble Falls, Texas 78654

8.14 **Counterparts.** This Agreement may be executed in counterparts, all of which taken together shall constitute one agreement.

**[Signature Page Follows]**

**EXECUTED AND DELIVERED** on the date first above recited.

BORROWER:

**BUBBLES & BARKS HOLDINGS, LLC,**
a Texas limited liability company

By: _____
      Gary M. Eggleston Jr., Manager

By: _____
      Jamie P. Eggleston, Manager

**BUBBLES & BARKS, LLC,**
a Washington limited liability company

By: _____
      Gary M. Eggleston Jr., Member

By: _____
      Jamie P. Eggleston, Member

GUARANTORS:

_____
Gary M. Eggleston Jr.

_____
Jamie P. Eggleston

_____
Brianna D. Eggleston

**EXECUTED AND DELIVERED** on the date first above recited.

**BORROWER:**

**BUBBLES & BARKS HOLDINGS, LLC,**
a Texas limited liability company

By: _____
Gary M. Eggleston Jr., Manager

By: _____
Jamie P. Eggleston, Manager

**BUBBLES & BARKS, LLC,**
a Washington limited liability company

By: _____
Gary M. Eggleston Jr., Member

By: _____
Jamie P. Eggleston, Member

**GUARANTORS:**

_____
Gary M. Eggleston Jr.

_____
Jamie P. Eggleston

_____
Brianna D. Eggleston

**LENDER:**

**LIVE OAK BANKING COMPANY**

By: _____

Printed Name: _Frances Nunnally_

Title: _Bank Officer_

# EXHIBIT "A"

## Property Description

FIELD NOTES to accompany a survey plat for a 7.54 acre tract of land out of the Jefferson Barton Survey No. 104, Abstract No. 58, Burnet County, Texas, and being out of that certain tract of land described as 10 acres in a deed to Robert Lee Pacini and wife, Olivia Ann Pacini, recorded in Volume 641, Page 322 of the Real Property Records of Burnet County, Texas, and being the same tract of land described as 7.533 acres in a deed to Joe F. Adams and wife Carol S. Adams, recorded in Volume 707, Page 202 of the Real Property Records of Burnet County, Texas.

BEGINNING at a ½" iron rod found at the intersection of the north right-of-way line of F.M. Highway No. 1855, with the east line of Burnet County Road No. 121, for the southwest corner hereof and of said 10.00 acre tract.

THENCE N12°10'19"W (called N12°10'19"W), with the west line hereof and of said 10.00 acre tract, being the east line of said Burnet County Road No. 121, and partially with or near a wire fence, a distance of 591.16 feet (called 591.17 feet) to a ½" iron rod found at the base of a fence corner post at the southwest corner of that certain tract of land described as 10.00 acres in a deed to Collier Materials, Inc., recorded in Volume 1022, Page 805 of the Official Public Records of Burnet County, Texas, for the northwest corner hereof and of said 10.00 acre tract;

THENCE, with the north line hereof and of said 10.00 acre tract, being the south line of said 10.00 acre tract recorded in Volume 1022, Page 805, and with or near a wire fence, the following 2 calls:

1) N73°20'35"E (called N73°23'15"E), a distance of 313.82 feet (called 314.04 feet) to a ½" iron rod found at the base of a fence post for an angle point hereof;

2) N59°45'56"E (called N59°39'44"E), a distance of 244.09 feet (called 243.87 feet) to a ½" iron rod found at a fence corner post at the northwest corner of that certain tract of land described as 12.27 acres in a deed to the William H. Lancet and wife, Rita Lancet, recorded in Volume 1118, Page 581 of the Official Public Records of Burnet County, Texas, for the northeast corner hereof;

THENCE S12°00'06"E (called S12°00'57"E), with the east line hereof, being the west line of said 12.27 acre tract, and with or near a wire fence, a distance of 649.22 feet (called 649.33 feet) to a ½" iron rod found in the north right-of-way line of said F.M. highway No. 1855, being the south line of said 10.00 acre tract recorded in Volume 641, Page 222, and being the southwest corner of said 12.27 acre tract, for the southeast corner hereof, from which a ½" iron rod found at the southeast corner of said 10.00 acre tract recorded in Volume 641, Page 222 bears N73°25'22"E (called 73°23'15"E), a distance of 317.13 feet (called 317.14 feet);

THENCE S73°23'15"W (Basis of Bearings), with the south line hereof and of said 10.00 acre tract recorded in Volume 641, Page 222, being the north right-of-way line of said F.M Highway No. 1855, partially with or near a wire fence, a distance of 544.62 feet to the place of beginning and containing 7.54 acres.

EXHIBIT "A" - Page Solo